Syllabus.

THE PEOPLE *ex rel.* Joel M. Longenecker, State's Attorney,

*v.*

MURRY NELSON *et al.*

*Filed at Ottawa June 12, 1890.*

1. STATUTES—TITLE OF AN ACT—*constitutional requirement—prior to the existing rule.* Before the present constitutional provision on the subject, the title to an act was no part of it, and although it might be looked to as a guide to the intention of the law-makers, where the body of the statute appeared ambiguous or doubtful, yet it could not enlarge or restrict the provisions of the act itself, and the latter might be good even when in conflict with the title, and there might be incorporated into the same act as many different subjects as the legislature saw fit.

2. SAME—*restrictions of present constitution— of their application, generally.* The provisions of section 13, article 4, of the constitution of 1870, should be so construed as to put an end to the former vicious legislation intended to be prevented, but it is not the design of those provisions to embarrass legislation by making laws unnecessarily restrictive in their scope and operation. The general purpose is accomplished when a law has but one general object, which is fairly indicated by its title.

3. The generality of a title is not objectionable, so long as it is not made to cover legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection. The legislature must determine for itself how broad and comprehensive shall be the object of a statute, and how much particularity shall be employed in the title defining it. It is purely a matter of legislative discretion whether the subject expressed shall be general or specific.

4. SAME—*act embracing more than one subject—and all expressed in the title.* Where an act embraces two subjects, both of which are expressed in the title, the entire act must be held void. In that case, a proviso that if any subject is embraced in the act which is not expressed in the title, the act shall be void only as to so much as is not so expressed, can not be given effect. The court can not elect between them, so as to preserve the one and reject the other.

5. SAME—*whether more than one subject is expressed—as, in the "sanitary" act of 1859.* A subject may be composed of many parts, and it does not follow that because the title of an act enumerates many particulars there are therefore many subjects. If there is but one subject, the act is valid, although the subject may be composed of many parts, and all of them are enumerated in the title.

6. ·So in the act of 1889, entitled "An act to create sanitary districts, and to remove obstructions in.the Des Plaines and Illinois rivers," the general subject expressed is the creation of sanitary districts, and the removal of obstructions in the rivers named is so far germane to that subject as to constitute a part of it. There is therefore but one subject expressed in the title.

7. SAME—*act embracing subjects not in title.* If an act of the legislature embraces several subjects, of which but one is expressed in the title, the subjects not expressed may be rejected, and the act, so far as it relates to the subject expressed in the title, may be held to be valid.

8. SAME—*measures promotive of the purposes of the act—as germane to the general subject—and herein, of an act to create a sanitary district.* A sanitary district is a municipal corporation organized to secure, preserve and promote the public health. Any subsidiary measure having a greater or less tendency to promote that object, or to advance the general scheme by which it is proposed, through the agency of such organization, to preserve and protect the public health, is germane to the general subject of the act.

9. If the general scheme adopted is one which, upon any rational theory, is calculated to promote the object for which the corporation is created, and if the subsidiary provisions of the act are calculated, upon any rational theory, to promote and further the general scheme, the provisions of the act can not be foreign to the general subject expressed in the title.

10. All corporations in this country are the creatures of the legislative power, and it necessarily follows that the determination as to what shall be their constitution, objects and powers, is a matter wholly within the legislative discretion. Any measures authorized which are calculated to promote the object of the corporation, may be said to be embraced in the title.

11. In the creation of municipal corporations of a certain character, as, for sanitary purposes, the subject expressed in the title of the act includes the investing of the corporation created with all necessary and proper powers, functions and duties, and provisions directing the mode in which those powers, functions and duties shall be exercised and performed, and prescribing the rules of public policy which shall obtain and be observed in their performance, are clearly germane to the same subject.

12. Where a sanitary district is formed to construct a system of drainage, which in its results will necessarily affect certain rivers and canalways by largely increasing the volume of water therein, provisions of the act creating the district, which impose duties upon the district to take proper steps to prevent injury to others by such increased flow of water, are a necessary part of the general system of drainage for sanitary purposes, and within the object expressed in the title of the act.

13. A law for the formation of a sanitary district for the drainage of a large territory, in addition to empowering the district to construct and maintain a channel of certain dimensions and capable of producing a flow of water of certain magnitude for drainage purposes, declared such channel, when constructed, a navigable stream, and authorized the district to make, establish, lease and control docks, and also to dispose of any water-power incidentally created in the construction of the channel: *Held,* that as the primary object of the act was for drainage for sanitary purposes, it was not subject to the charge of a duplicity of objects. Every intendment is in favor of the validity of the act.

14. Where a corporation is authorized to construct channels for drainage purposes, whereby, incidentally, large and valuable water-powers may be created and opportunities afforded for the construction of valuable docks, and such valuable privileges are brought into existence, the corporation may utilize such privileges as a source of revenue, for the purpose of paying its indebtedness incurred in constructing such channel. But the power of the corporation to charge for the use of water privileges will not arise until such channel is constructed.

15. SAME—*who may be employed—creating sanitary corporation— excluding persons not naturalized, etc.* A provision in an act for the organization of sanitary districts, for the construction of important public works, prescribing the qualifications of persons who shall be employed on such works, is strictly germane to the general subject of constructing the works. And it is competent for the legislature to establish, as a rule of public policy, that none but citizens, or those who in good faith have taken the preliminary steps to secure naturalization, shall be employed thereon, and also to establish a test by which the good faith of persons declaring their intentions to become citizens may be determined.

16. EQUALITY OF TAXATION—*act creating a sanitary district—whether in violation of the rule of equality.* An act for the formation of a sanitary district, with power to construct a channel capable of carrying a large body of water, provided that the corporation thus formed might lease water privileges and places for docks, but contained this proviso: "*Provided, however,* nothing in this act shall be construed to abridge or prevent the State from hereafter requiring a portion of the funds derived from such water-power, dockage or wharfage to be paid into the State treasury to be used for State purposes:" *Held,* that the proviso is not in violation of the constitution in compelling the people of one class of municipal corporations to pay more than their share of the burdens of the State government. The proviso does not attempt to divert any of the revenues of the district, but it merely declares that the State is not concluded from requiring payment to be made to it.

17. ELECTIONS—*cumulative voting—under an act for the election of trustees of a municipal corporation, as, in the creation of a sanitary dis-*

*trict.* A law for the organization of municipal corporations called sanitary districts, provided for the election of nine trustees, giving each voter the right to vote for as many candidates as there are trustees to elect, or the privilege of distributing his votes among not less than five-ninths of the candidates to be elected, giving each of the candidates among whom he distributes the same, the same number of votes or fractional votes: *Held,* that the provision was not in violation of any constitutional provision relating to suffrage.

18. If the act had made the cumulation of votes necessary, then each voter would have been deprived of the privilege of voting, at the election, for part of the officers to be elected, and to that extent would have been excluded from his constitutional right.

19. JUDICIAL OFFICERS—*executing other than judicial duties.* An act of the legislature giving the circuit or county courts the power to appoint commissioners, is a valid law; and powers and duties imposed by statute upon a circuit judge, not incompatible with his duties as judge, may be rightfully exercised by him, as, celebrating marriages, and taking the acknowledgment of deeds.

20. So an act which imposes certain non-judicial duties upon the county judge, and two circuit judges to be selected by him, to fix the territory to be embraced by a sanitary district, prior to the submitting of the question of incorporating to a vote, is not repugnant to article 3 of the constitution, which distributes the powers of the government into three classes, and prohibits either branch from exercising any powers of the others.

21. VALIDITY OF A STATUTE—*presumption.* Every presumption is in favor of the validity of a statute, and every reasonable doubt must be resolved in favor of its constitutionality. The courts will never declare a statute void, except in a clear case.

22. Whenever an act of the legislature can be so construed and applied as to avoid a conflict with the constitution, and give it the force of law, such construction should be adopted.

APPEAL from the Circuit Court of Cook county; the Hon. JULIUS S. GRINNELL, Judge, presiding.

This was an information, in the nature of a *quo warranto,* filed by Joel M. Longnecker, state's attorney for Cook county, against Murry Nelson, John A. King, Richard Prendergast, Frank Wenter, William H. Russel, Arnold P. Gilmore, John J. Altpeter and Henry J. Willing, alleging that the defendants have usurped and are now unlawfully holding the office of

trustees of the Sanitary District of Chicago. The information alleges that said so-called sanitary district includes within its supposed boundaries a part of the city of Chicago, the whole of the incorporated town of Cicero, the village of Lyons, and other territory in Cook county; that there is no law authorizing or establishing the office of trustees of said sanitary district, but that the defendants claim and pretend that they are such officers or trustees, and have taken the oath of office prescribed by the Constitution; that they have elected Murry Nelson, one of their number, president, and have elected Austin Doyle clerk, S. S. Gregory attorney, Byron L. Smith treasurer, Charles Barry secretary and L. E. Conley engineer of said sanitary district; that they have the right to pass ordinances, issue bonds, and levy taxes for the payment of the same; that they have actually passed an ordinance providing for the issue of bonds to the amount of $1,000,000, and to levy a tax with which to pay the interest thereon and to create a sinking fund with which to pay the principal; that they insist and claim that they hold the office of sanitary trustees as aforesaid, and have the legal right to exercise said powers, and all the powers set forth and specified in the act of the General Assembly entitled, "An act to create sanitary districts, and to remove obstructions in the Des Plaines and Illinois rivers," approved March 29, 1889, and that said act was adopted as therein provided by a vote of the electors of said district at an election held on the first Tuesday after the first Monday in November, 1889, and that at another election afterwards held according to the provisions of said supposed act for the election of trustees of said sanitary district, the defendants and one Christopher Hotz received a majority of the votes cast, and that they hold their office of trustees of said sanitary district by virtue of said act and of said elections.

The information further alleges that said act of the General Assembly is in violation of the provisions of the Constitution of the State of Illinois and is therefore void; that the defend-

ants are proceeding to exercise all the powers set forth and specified in said act, and that by reason of the unlawful assumption and exercise of said offices and of said claim of right to do the acts and things aforesaid, great confusion, disorder and injury have resulted and will result to the people residing within the boundaries of said so-called sanitary district.

The defendants appeared and pleaded to the information, setting up the passage of said act by the General Assembly, and alleging that, under the authority thereby conferred, they are now performing and exercising the duties, franchises and obligations imposed upon the board of trustees of the Sanitary District of Chicago. They further allege that, on the 15th day of August, 1889, over five thousand legal voters residing in the proposed sanitary district petitioned the county judge of Cook county to cause the question whether they would organize as a sanitary district under said act to be submitted to the legal voters of said district; that said county judge thereupon called to his assistance two of the judges of the Circuit Court of said county, and that the board of commissioners constituted of the three, after giving due notice, met in the room usually occupied by said County Court, and considered whether the boundaries of said proposed district should be as described in said petition or otherwise, and after giving all persons who desired to do so an opportunity to make suggestions regarding the location and boundaries of the proposed district, fixed and determined the limits and boundaries of said district so as to include all the city of Chicago except that part lying south of Eighty-seventh street, and all the territory embraced in the incorporated town of Cicero and in the incorporated village of Lyons, and also a portion of the territory of the township of Lyons; that said district constitutes an area of contiguous territory within the limits of Cook county, and is so constituted that the maintenance of a common outlet for the drainage thereof will conduce to the promotion of the public health, and that all of said territory is situated within the limits of a city,

incorporated town or village, or within three miles thereof, and that no part of it was or is within the limits of any other sanitary district formed under said act.

The plea further alleges that said county judge thereupon submitted to the legal voters of said sanitary district the question of the organization and establishment thereof, at an election held on the first Tuesday after the first Monday of November, 1889, and that at said election the majority of all the votes cast were in favor of the proposed sanitary district, the number of affirmative votes cast being 70,958, and the number of negative votes being only 242, and that the result of said election was duly declared by said county judge, and spread upon the records of said county court; that thereupon said county judge called an election to elect trustees of said drainage district, and that such election was called and held in accordance with the provisions of said act, and that at said election the defendants and said Christopher Hotz received a majority of all the votes cast, and were declared elected trustees of said sanitary district, and that certificates of such election were duly issued to them; that each of the defendants took the oath of office required by the Constitution, and that they afterwards met and organized as a board, by electing the various officers alleged in the information, and fixed and established the compensation and salaries of said officers.

The plea further alleges that, by reason of the foregoing, the defendants severally became duly qualified as trustees of and for the Sanitary District of Chicago, and that they hold said office, with all the rights and emoluments thereof until their successors shall be duly elected and qualified as provided in said act; that said Christopher Hotz has never qualified nor entered upon the performance of the duties of said office; that in all particulars said act was complied with and that the result of said election was actually as declared, and that in pursuance thereof, each of the defendants did, as he legally might do, enter upon the discharge of the duties of trustee of

said sanitary district, and thenceforth did and does now discharge the duties of said office, and has and enjoys all the liberties, privileges and franchises of said office, as he well might and still may do, under the authority conferred and the duties imposed by said act, without this, that they or either of them have unlawfully intruded into, usurped or unlawfully held or executed, or does now unlawfully intrude into, usurp or unlawfully hold or execute the said office of sanitary trustee of said district.

To the foregoing plea the People filed a general demurrer, which was overruled by the court, and the People having elected to abide by said demurrer, judgment was entered thereon that the information be dismissed and that the defendants go thereof without day. From said judgment the People have appealed to this court.

Mr. GEORGE HUNT, Attorney General, and Mr. G. S. ELDRIDGE, for the appellants :

It would seem that there can not now be a doubt as to the limit of the source of revenue which may be resorted to for drainage purposes, viz., "by special assessment upon the property benefited thereby." *Kilgour case,* 111 Ill. 350; *Owners of Lands* v. *People,* 113 id. 306; *Updike* v. *Wright,* 118 id. 451; *Moore* v. *People,* 106 id. 376; *Blake* v. *People,* 109 id. 521.

The court can readily see that the act to create sanitary districts, etc., is special in its application, or a local law. It was intended to apply to no other locality than the city of Chicago.

Mr. W. T. BURGESS, a tax-payer, *pro se.*

Mr. GEORGE M. HARRIS, *amicus curiæ.*

Messrs. WILSON & MOORE, and Mr. S. S. GREGORY, for the appellees.

Mr. Justice Bailey delivered the opinion of the Court:

By the averments of their plea, the truth of which is admitted by the demurrer, the defendants have established their title to the office which the information charges them with having usurped, unless the act under which the Sanitary District of Chicago is organized is so far unconstitutional as to render the organization of said district and the election of its trustees inoperative and void. This seems to be admitted by counsel, since the only questions presented by them for our consideration are those which involve the validity of said act. Counsel for the prosecution insist that the act as a whole, and in various of its subordinate provisions, contravenes the Constitution of the State, but as this proceeding involves the single question of the defendants' title to the office which they are charged with having usurped, no objections to the act need be considered except those which go to the validity of the organization of the district and of the election of its trustees. The various grounds upon which the constitutionality of the act is assailed may be summarized as follows:

1. That the title of the act expresses and the act embraces more than one subject.

2. That the act embraces various subjects which are not expressed in the title.

3. That the act is a local or special act.

4. That it provides for cumulative voting at the elections of the trustees of the sanitary districts organized under it.

5. That in providing the machinery for the organization of sanitary districts, the act imposes upon the judge of the County Court and two judges of the Circuit Court duties which are incompatible with their duties and functions as judges of those courts.

6. That the act is an evasion of the constitutional provision which limits the indebtedness which a municipal corporation shall be allowed to incur in any manner and for any purpose to five *per centum* of the value of the taxable property therein.

7. That the municipal authorities of sanitary districts are vested with the power of general taxation, and are not limited to special assessments upon the property benefited for the payment of the drainage system which they are authorized to construct.

Of these propositions, the third, sixth and seventh are sufficiently considered in *Wilson* v. *Board of Trustees of Sanitary District of Chicago et al. ante*, p. 443, and we do not deem it necessary to add anything here to what we there said. In that case we held that upon neither of these grounds can said act be declared unconstitutional, and in support of that conclusion we need now only refer to the opinion there filed.

The first two of the grounds above mentioned upon which the constitutionality of said act is assailed are based upon the following provision of section 13, article 4, of the Constitution of 1870, viz: "No act hereafter passed shall embrace more than one subject and that shall be expressed in the title. But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed."

Formerly the title to an act was considered no part of it, and although it might be looked to as a guide to the intent of the law-makers when the body of the statute appeared to be in any respect ambiguous or doubtful, yet it could not enlarge or restrain the provisions of the act itself, and the latter might therefore be good when that and the title were in conflict. Nor was there any rule forbidding the incorporation into the same act of as many different subjects as the legislature might see fit, entirely regardless of whether they bore any logical relation to each other or not. While these rules prevailed, the enactment of laws became subject to very serious abuses. These, in the main, consisted, first, of incorporating into the same bill various measures having no proper relation to each other, so as to enlist in favor of the bill support which neither measure singly could obtain on its own merits. This

resulted in a species of "log-rolling" legislation, which was both corruptive of the legislature and dangerous to the State. In the second place, titles were often prefixed to bills which were inadequate or misleading, or which afforded no intimation whatever of the true nature of the measure proposed, thus deceiving the members of the legislature and the public. That these were serious evils can not be doubted, nor can we doubt the wisdom of those constitutional provisions which have been adopted for their correction.

But while these provisions should be so construed as to put an end to legislation of the vicious character above referred to, it is not their design to embarrass legislation by making laws unnecessarily restrictive in their scope and operation. *People* v. *Mahaney*, 13 Mich. 481. Their general purpose is accomplished when a law has but one general object which is fairly indicated by its title. The generality of a title is therefore no objection to it, so long as it is not made to cover legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection. The legislature must determine for itself how broad and comprehensive shall be the object of a statute, and how much particularity shall be employed in the title defining it. Cooley's Const. Lim. (5th ed.) 174.

It should be remembered in this connection that every presumption is in favor of the validity of a statute. It follows that every reasonable doubt must be resolved in favor of the action of the legislature, and that where such doubt exists the statute must be sustained. Cooley on Const. Lim. 218, and authorities cited in notes. As said by Chief Justice Shaw in *Wellington et al. Petititioners, etc.* 16 Pick. 87: "When called upon to pronounce the invalidity of an act of legislation passed with all the forms and solemnities requisite to give it the force of law, courts will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new

light on the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt." In *E. & N. E. R. R. Co.* v. *Casey*, 26 Pa. St. 287, and again in *Powell* v. *Commonwealth*, 114 id. 265, the Supreme Court of Pennsylvania lays down the same doctrine in the following language: "The right of the judiciary to declare a statute void and to arrest its execution, is one which, in the opinion of all courts, is coupled with responsibilities so grave that it is never to be exercised except in very clear cases. One department is bound to presume that another has acted rightly. The party who wishes to pronounce a law unconstitutional takes upon himself the burden of proving beyond a reasonable doubt that it is so." The foregoing is familiar law, and has frequently been announced as such by this court. *C., D. & V. R. R. Co.* v. *Smith*, 62 Ill. 268; *Hawthorn* v. *The People*, 109 id. 302; *People* v. *Hazelwood*, 116 id. 319; *Wulff* v. *Aldrich*, 124 id. 591; *Field* v. *The People*, 2 Scam. 79; *Lane* v. *Dorman*, 3 id. 237; *People* v. *Marshall*, 1 Gilm. 672; *People* v. *Reynolds*, 5 id. 1.

Akin to the principles above stated, or following as a legitimate corollary therefrom, is the further rule that, whenever an act of the legislature can be so construed and applied as to avoid a conflict with the Constitution and give it the force of law, such construction will be adopted. *Newland* v. *Marsh*, 19 Ill. 376; *Bigelow* v. *W. W. R. R. Co.* 27 Wis. 478; *Attorney-General* v. *Eau Claire*, 37 id. 400; *Dow* v. *Norris*, 4 N. H. 16; *People* v. *Supervisors*, 17 N. Y. 235.

The relator, as we have already seen, in alleging that the act in question contravenes the clause of the Constitution which provides that no act shall embrace more than one subject and that such subject shall be expressed in the title, presents two propositions, first, that both the act and the title embrace more than one subject, and, second, that the act embraces various subjects which are not expressed in the title. These propositions must be considered separately, since it is

manifest that sustaining the first would involve very different legal consequences from those which would follow if the second only should be sustained. If the act embraces two subjects and both are expressed in the title, the entire act must be declared void, as in that case the proviso that if any subject is embraced in the act which is not expressed in the title the act shall be void only as to so much as is not so expressed, can have no application. If two subjects are both embraced in the act and expressed in the title, we can not elect between them so as to preserve one and reject the other, but the entire act must fall by reason of being in contravention of the constitutional limitation. If the objection, however, is only that the act embraces several subjects of which but one is expressed in the title, the subjects not expressed may be rejected, and the act, so far as it relates to the subject expressed in the title, may be held to be valid.

As we have said, the generality of the subject expressed in the title is no objection to it, since it is purely a matter of legislative discretion whether the subject expressed shall be general or specific. And it is clear that the broader and more general the subject, the greater the number of particular or subordinate subjects which will be embraced within it. Thus, to illustrate, if the title of an act should be, "An act to define and punish the crime of larceny," it is clear that provisions defining perjury, arson or felonious homicide and fixing the punishment of those offenses would be subjects wholly foreign to the title of the act. But if the title should be, as is. the case with our present Criminal Code, "An act to revise the law in relation to criminal jurisprudence," the subject thus expressed would clearly be broad enough to include provisions defining and fixing the punishment, not only of these, but of all other imaginable offenses against the public law, and also all proper provisions for the prevention of crimes, for the indictment, trial, conviction and punishment of all classes of offenders, and for fixing the jurisdiction, both original and

37—133 Ill.

appellate, of the various courts in criminal cases, and prescribing the mode of procedure and the rules of evidence applicable to criminal trials. These subjects, multiplied as they . are in detail, are all included in the general subject of criminal jurisprudence, and if the title of our Criminal Code, in expressing the subject of the act, had added to the words, "to revise the law in relation to criminal jurisprudence," as follows: "and to define and punish larceny, perjury, arson," etc., inserting a catalogue of every distinct species of crime known to the law, there would still have been but one subject expressed.

In *Bitters* v. *Board of Commissioners*, 81 Ind. 125, the court, in discussing the validity, in view of a similar provision of the Constitution of that State, of an act the title of which contained various specifications of subjects, say: "A subject may be composed of many parts. It does not follow that because the title of a statute enumerates many particulars, there are, therefore, many subjects. If there is but one subject the act is valid although the subject may be composed of many parts, and all of them are enumerated in the title." · In *Clare* v. *The People*, 9 Colo. 122, the court having under consideration a similar title, say: "There being one general subject expressed, the fact that the legislature saw fit to incumber this title with two specifications under that subject does not render it obnoxious to the constitutional objection now urged. One of the two purposes effected by this constitutional provision was, to prevent uniting with each other in statutes incongruous matter having no necessary connection or proper relation; and where, as in the case at bar, one general subject is expressed, the addition of subdivisions thereof does not necessarily vitiate the whole title." The true rule in cases of this character seems to us to be well expressed in *Shoemaker* v. *Smith*, 37 Ind. 122, as follows: "If the different particulars enumerated are to be regarded as so many different subjects, then the law is wholly void because of a multiplicity of sub-

jects. If, on the other hand, the enumerated particulars do not embrace different subjects, but have reference to one subject, which is not sufficiently expressed in the title, the law is still void. If, however, the enumerated particulars are not expressive of different subjects but of one general subject, which is sufficiently expressed, the law is valid."

The title to the act before us is, "An act to create sanitary districts, and to remove obstructions in the Des Plaines and Illinois Rivers." The general subject thus expressed is, the creation of sanitary districts, and the question is, whether the removal of obstructions in the Des Plaines and Illinois rivers is so far germane to that subject as to constitute a part of it. Sanitary districts are municipal corporations which, in their constitution and purpose, are unlike any class of municipal corporations heretofore existing in the State. They are, so to speak, a new product of the creative power of the Legislature. Their character and purpose are both indicated and limited by the word "sanitary," and it must be admitted that the general objects and purposes of the municipal corporations organized under said act must be restricted to such as are fairly to be implied from the use of that word. The word "sanitary" is defined by Webster to mean, "pertaining to, or designed to secure, sanity or health; relating to the preservation of health." It would seem to follow that a sanitary district is, *ex vi termini,* a municipal corporation organized to secure, preserve and promote the public health. This being the general purpose of the organization, it must be admitted that any subsidiary measure having a greater or less tendency to promote that object, or to advance the general scheme by which it is proposed, through the agency of such organization, to preserve and protect the public health, is germane to the general subject of the act.

All corporations, as they exist in this country, are the creatures of legislative power, and it necessarily follows that the determination as to what shall be their constitution, ob-

jects and powers is a matter wholly within the legislative discretion.    That discretion is undoubtedly controlled by the constitutional provision limiting every legislative act to one subject and requiring that subject to be expressed in the title, but except so far as controlled by such limitations as the Constitution imposes, the discretion is absolute.  The Legislature having in this case adopted a title which expresses as the subject of the act the creation of sanitary districts, it thereby limited itself to the creation of corporations having for their general object the promotion and preservation of the public health, but complete discretion was retained as to the character and scope of the scheme to be adopted for the attainment of that object.  In construing what the Legislature has done in the exercise of that discretion therefore, every reasonable intendment must be indulged in which favors their validity.  If the general scheme adopted is one which, upon any rational theory, is calculated to promote the object for which the corporation is created, and if the subsidiary provisions of the act are calculated, upon any rational theory, to promote and further the general scheme, the provisions of the act can not be foreign to the general subject expressed in the title.

The general sanitary scheme adopted by the act consists of creating certain districts comprising certain areas of contiguous territory, and empowering such districts to construct and maintain a common outlet for the drainage and sewage of their respective territories.   That scheme is indicated in the first section of the act as follows :  "That whenever any area of contiguous territory within the limits of a single county shall contain two or more incorporated cities, towns or villages, and shall be so situated that the maintenance of a common outlet for the drainage thereof will conduce to the preservation of the public health, the same may be incorporated as a sanitary district under this act."   Of course it must be conceded, both as a historical fact and as a fact abundantly shown by the terms of the act itself, that this scheme was formulated mainly

if not exclusively with reference to the sanitary condition and needs of the city of Chicago and its environs, and we can not give proper construction to the act without taking into account the peculiar situation of the territory which the proposed Sanitary District of Chicago was intended to embrace.   Chicago is a city of probably one million inhabitants or more, and is bordered on the east by Lake Michigan, that lake being the source of its water supply.   A few miles west of Chicago, and running in a north and south direction, is the Des Plaines River, and at a point opposite the southerly part of the city said river turns toward the south-west and runs in that direction to the city of Joliet, below which it is known as the Illinois River.   The territory between Lake Michigan and the Des Plaines River, and along the course of that river to Joliet, is nearly level, none of it being more than a few feet above the level of the lake, while at Joliet the general surface is quite a number of feet below the level of the lake.   The object of the system of drainage proposed by said act is, to prevent the drainage and sewage of the city and its environs being carried into Lake Michigan, thereby contaminating the waters of the lake.   This result is to be reached by cutting a channel which will give an outlet for the drainage and sewage of the city in the direction of the Des Plaines and Illinois Rivers, and which will also cause a large flow of water from the lake through the proposed artificial channel into those rivers for the purpose of diluting the sewage and rendering it innocuous to the people living along the course of those streams.

The question then arises whether the removal of obstructions from the Des Plaines and Illinois Rivers is or is not germane to this scheme of drainage.   If in any point of view the removal of said obstacles will be rendered necessary by the increased flow of water in those rivers, or if such removal can be deemed to be in any way subsidiary to the drainage system or promotive of its proper objects, it must be held to be a part of the system, although it may incidentally result in the im-

provement of those rivers for purposes of navigation. And in that case the expression of such removal in the title of the bill can not be deemed the expression of another subject, but the enumeration of a particular matter included in the general subject already expressed.

We think it clear that the removal of obstructions in said rivers may, and probably will, be rendered necessary as a part of the work required to secure the proposed drainage. The act contemplates a minimum flow of 300,000 and a maximum flow of 600,000 cubic feet of water per minute through the proposed artificial channel into said rivers, and it is likely that, in order to prevent, so far as possible, damage to riparian lands by floods caused by the increase in the volume of water, it will become necessary to remove various obstructions now existing in said rivers. Among these are the dams heretofore constructed by the State for the purpose of improving the navigation of the Illinois River, and the act specifically confers upon the district the power to make such removal.

We are of the opinion then that the act is capable of such construction as will relieve its title from the charge of duplicity of subjects, and such construction being logically possible, it is the one which must be adopted. But we are of the opinion that said construction is not only logically possible, but that it is the obvious and only fair construction which can be placed upon the act. The same course of reasoning also relieves the act itself from the charge of duplicity of subjects, at least so far as the matter of removal of obstructions in said rivers is concerned.

Having disposed of the objections to said act growing out of the form of the title, it remains to be seen whether the act itself embraces subjects not expressed in the title, and is invalid for that reason. The first six sections of the act prescribe the mode in which sanitary districts may be organized, and provide for the election of nine trustees and for their organization into a board of trustees, and constitute them the corpo-

rate authorities of their district. Said sections also provide for the appointment of a president and various subordinate officers of the board, and empower the board to pass all necessary ordinances, rules and regulations for the proper management and conduct of the business of the board and of the corporation, and for carrying into effect the objects for which such sanitary district is formed.

Section 7 authorizes the board of trustees "to provide for the drainage of such district, by laying out, establishing, constructing and maintaining one or more main channels, drains, ditches and outlets for carrying off and disposing of the drainage (including the sewage) of such district, together with such adjuncts and additions thereto as may be necessary or proper to cause such channels or outlets to accomplish the end for which they are designed in a satisfactory manner; also to make and establish docks adjacent to any navigable channel made under the provisions hereof for drainage purposes, and to lease, manage and control such docks, and also to control and dispose of any water-power which may be incidentally created in the construction and use of said channels or outlets, but in no case shall said board have any power to control water after it passes beyond its channel, waterways, races or structures into a river or natural water-way or channel, or water-power or docks, situated on such river or natural water-way or channel: Provided however, nothing in this act shall be construed to abridge or prevent the State from hereafter requiring a portion of the funds derived from said water-power, dockage or wharfage to be paid into the State Treasury to be used for State purposes. Said channels or outlets may extend outside of the territory included within such sanitary district, and the rights and powers of said board of trustees over the portion of such channel or outlet lying outside of such district shall be the same as those vested in said board over that portion of such channels or outlets within said district."

Section 8 authorizes such sanitary district to acquire by purchase, condemnation or otherwise, the right of way or privilege, either within or without its corporate limits, that may be required for its corporate purposes. Section 9 authorizes the district to borrow money and issue its bonds therefor, but not so as to become indebted to an amount in the aggregate exceeding five *per centum* on the valuation of the taxable property therein, and not to exceed $15,000,000. Section 10 provides that before incurring any indebtedness, the board of trustees shall provide for the collection of a direct tax sufficient to pay the interest as it falls due, and also to pay and discharge the principal thereof at maturity, and at least within twenty years from the time of contracting the same, but authorizes the application of the net earnings from water-power and docks to the payment of the interest or principal, and provides for a corresponding reduction of the direct tax whenever such net earnings shall be so applied.

Section 11 directs that all contracts for work to be done by such district, the expense of which will exceed $500, shall be let to the lowest responsible bidder, after giving certain notice, but provides that no person shall be employed on said work who is not a citizen of the United States, or has not in good faith declared his intention to become such citizen, and declares that the neglect by any person having made such declaration of intention to perfect his naturalization for the space of three months after he can lawfully do so, shall be *prima facie* evidence that his declaration was not made in good faith. Section 12 limits the amount of taxes which may be levied and collected by such district to one-half of one *per centum* per annum on the taxable property of the district, and prescribes the mode of levying and collecting the same.

Section 13 gives the board of trustees power to defray the expense of any improvement by special assessment, or by general taxation, or partly by each, and it is provided that it shall constitute no objection to a special assessment that the

improvement for which it is levied is partly outside of the
district, but that no property outside of the district shall be
assessed, and that no property shall be assessed more than it
will be benefited by the improvement. Sections 14, 15 and 18
relate to the mode of making special assessments. Section 16
relates to the mode of making compensation for private prop-
erty taken or damaged.

Section 17 provides that when it shall be necessary in
making any improvement, to enter upon any public property,
or property held for public use, the district shall have the
power to do so, and may acquire the necessary right of way
over such property in the same manner as is in said act pro-
vided for acquiring private property, and may enter upon, use,
widen, deepen and improve any navigable or other waters,
water-ways, canal or lake, provided the public use thereof
shall not be unnecessarily interrupted or interfered with, and
that the same shall be restored to its former usefulness as soon
as practicable, and provided that the district shall not occupy
any portion of the Illinois and Michigan Canal outside of the
limits of the county in which the district is situated for the
site of any such improvement, except to cross the same, and
then only in such way as not to impair the usefulness of said
canal, or to the injury of the rights of the State therein, and
only under the direction and supervision of the Canal Com-
missioners, and provided further, that no district shall be re-
quired to make any compensation for the use of so much of
the canal as lies within the limits of the county, except for
transportation purposes.

Section 19 makes each sanitary district liable for all dam-
ages to real estate, within or without the district, which shall
be overflowed or damaged by reason of the construction, en-
largement or use of any channel, ditch, drain, outlet or other
improvement under the provisions of the act, and provides the
mode in which the same may be recovered. Section 20 pro-
vides that any channel or outlet which shall cause the discharge

of any sewage into or through any river or stream of water beyond or without the limits of the district shall be of sufficient size and capacity to produce a continuous flow of water of at least 200 cubic feet per minute for each 1000 of the population of the district drained thereby, and shall be kept and maintained of such size and in such condition that the water thereof shall be neither offensive nor injurious to the health of any of the people of the State, and that before any sewage shall be discharged into such channel or outlet, all garbage, dead animals and parts thereof and other solids shall be taken therefrom.

Section 21 provides that in case any sanitary district shall introduce sewage into any stream of water or natural or artificial water-course beyond the limits of the district, without conforming to the provisions of the act, or shall fail to comply with the provisions of the act, suit shall be brought by the Attorney General to enforce such compliance. Section 22 declares that nothing contained in the act shall be construed as a contract or grant between the State and a sanitary district, or to deprive the State, at any time in the future, of the power to alter, amend or repeal the act, or to impose different or additional conditions, restrictions or requirements.

Section 23 provides that if any channel is constructed by which the waters of Lake Michigan shall be caused to pass into the Des Plaines or Illinois Rivers, such channel shall be of sufficient size and capacity to produce and maintain at all times a continuous flow of not less than 300,000 cubic feet of water per minute, and to be of a depth of not less than 14 feet and having a current not exceeding three miles per hour; and if any portion of the channel shall be through rock, such portion shall have double the flowing capacity above provided for, and a width of not less than 160 feet at the bottom, and capable of a depth of not less than 18 feet of water; and that if the population of the district drained into such channel shall at any time exceed 1,500,000, such channel shall be made

and kept of such size and condition as to produce and maintain a continuous flow of not less than 20,000 cubic feet of water per minute for each 100,000 of the population of such district, at a current of not more than three miles per hour; and that if at any time the General Government shall improve the Des Plaines or Illinois Rivers so that the same shall be capable of receiving a flow of 600,000 cubic feet of water per minute or more from said channel, and shall provide for the payment of all damages which any extra flow above 300,000 cubic feet per minute may cause to private property, said district shall within one year enlarge the entire channel to a sufficient capacity to produce and maintain a continuous flow through the same of not less than 600,000 cubic feet of water per minute, with a current of not more than three miles per hour, and the channel shall be constructed upon such grade as to be capable of producing a depth of water of not less than 18 feet of water throughout said channel, and shall be of a width of not less than 160 feet at the bottom. And in case such channel shall be constructed in the Des Plaines River, it shall be carried down the slope between Lockport and Joliet to the pool commonly known as upper basin of sufficient width and depth to carry off the water which the channel shall bring down from above. And it is further provided that the district may correct, modify and remove obstructions in the Des Plaines and Illinois Rivers whenever it shall be necessary so to do to prevent overflow or damage along said rivers, and shall remove the dams at Henry and Copperas Creek in the Illinois River before any water shall be turned into said channel; and the Canal Commissioners are empowered, in case they find a certain stage of water produced by said drainage, to remove the lock in the Illinois and Michigan Canal at LaSalle.

Section 24 provides that when the channel shall be completed and the water turned therein to the amount of 300,000 cubic feet per minute, it shall be declared a navigable stream; and that whenever the General Government shall improve the

Des Plaines and Illinois Rivers for navigation to connect with said channel, it shall have full control over the same for navigation purposes, but not to interfere with the control thereof by the district for sanitary and drainage purposes. Section 25 authorizes any sanitary district formed under said act to permit outlying territory to drain into and use its channels and drains, and authorizes any district to contract for the right to use any drain or channel which may be made by another district, and fixes the terms upon which such contract may be made.

Section 26 provides that whenever, in any sanitary district there shall be a city, incorporated town or village which owns a system of water-works and supplies water from a lake or other source, which will be saved and preserved from sewage pollution by the construction by a sanitary district of its main channel, drain, ditch or outlet and the turning of the sewage of such city and district therein, and there shall be in such district any territory bordering on such city, incorporated town or village within the limits of another city, incorporated town or village which does not own any system of water-works at the time of the creation of the sanitary district, then, upon application of the corporate authorities of the last mentioned city, town or village, the corporate authorities of the city, town or village having such system of water-works shall furnish water at the boundary line between such municipalities by means of its water-works, to the corporate authorities asking for the same, in such quantities as may be required to supply consumers within said territory, at no greater price or charge than it charges and collects of consumers within its limits for water furnished through meters in like large quantities.

The 27th and last section provides that, if a channel shall be constructed under the provisions of section 23, it shall be the duty of the trustees of the district, before any water or sewage shall be admitted therein, to notify the Governor, and that the Governor shall appoint three commissioners who shall

be residents at certain designated points along the Illinois River, and that such commission shall meet and make examination of the channel to ascertain whether it is of the character and capacity required by said act, and that if they find it in all respects in accordance with the provisions of section 23, they shall so certify to the Governor, who shall thereupon authorize the water and sewage to be let into said channel; but if they find it not in accordance with the provisions of said act, it shall be their duty to file a bill in chancery against the district, setting forth wherein the work is deficient, and that the court shall thereupon restrain the district from letting water or sewage into the channel until the further order of the court; and in case the court, on hearing, shall determine that the channel is not constructed in accordance with the provisions of said act, said injunction shall be continued until said provisions are complied with.    Said commissioners and their engineer are to be paid for their services out of the State Treasury, such payments to be reimbursed to the State by the sanitary district; and it is further provided if any channel shall discharge the sewage of more than 300,000 inhabitants into any river beyond the limits of the district, it shall be constructed in accordance with the provisions of section 23, and if any channel receives its supply of water from any river or channel connecting with Lake Michigan, it shall be construed as receiving its supply of water from said lake.

It is believed that the foregoing resume of said act is sufficiently full to present every feature of the act upon which is based the claim that it embraces a multiplicity of subjects, but the exigencies of this appeal do not render it necessary for us to consider every point of this character made by counsel. It may be that there are some provisions of the act which will be found to involve subjects not expressed in the title, though as to whether such is the case or not we express no opinion, except so far as we shall hereafter give to certain points made special consideration. It may, however, be said

generally that none of the points made by counsel in this branch of their argument, if sustained, would invalidate the defendants' title to the office of trustees of the Sanitary District of Chicago.    The only consequence of the inclusion in an act of subjects not expressed in the title is the invalidation of so much of the act·as relates to those subjects, and none of the subjects alleged to be foreign to the title involve the question of the legality of the organization of the district, or of its power to elect trustees to manage its affairs.

Among the provisions of the act which are said to involve subjects foreign to the title is the one which forbids the employment upon the· works to be constructed by the district of any person who is not a citizen of the United States or has not in good faith declared his intention to become such citizen, and which prescribes what shall be deemed *prima facie* evidence of want of good faith in making such declaration of intention. It is said that this is an attempt to legislate in regard to the naturalization laws of the United States, and undertakes to modify the rights of those who have declared their intention to become citizens, and that it therefore involves a subject. wholly foreign to that expressed in the title of the act.   We are unable to view this provision in the light here suggested. In the creation of municipal corporations of a certain character, the subject expressed in the title of the act, includes, *ex vi termini*, the investing of the corporations created with all necessary and proper powers, functions and duties, and provisions directing the mode in which those powers, functions and duties shall be exercised and performed, and prescribing the rules of public policy which shall obtain and be observed in their performance, are clearly germane to the same subject.    The sanitary districts provided for by the act are organized for the purpose of constructing important public works, and a provision prescribing the qualifications of the persons who shall be employed on such works is strictly germane to the general subject of constructing the works.    And it is competent for

the Legislature to establish, as a rule of public policy, that none but citizens or those who in good faith have taken the preliminary steps to secure naturalization shall be employed thereon, and also to establish a test by which the good faith of persons declaring their intention to become citizens may be determined. These provisions constitute no interference with the naturalization laws, nor do they take from one who has declared his intention to become a citizen any of his rights. Such declaration of his intention vests him with no right to be employed in the construction of these works, and it is therefore left wholly within the discretion of the Legislature to determine when and under what circumstances a man who has only taken the first step towards obtaining naturalization shall be qualified for employment in the construction of the proposed works.

It is urged, in the next place, that said act, in addition to the creation of the sanitary district and empowering it to construct and maintain a channel capable of producing the requisite flow of water through and out of the district, legislates in relation to the Des Plaines and Illinois Rivers and the Illinois and Michigan Canal, and in relation to the removal of the lock in the canal at LaSalle and the dams in the river at Henry and at Copperas Creek, and gives power to deepen, widen and improve these several water-ways, which are the property of the State, each of these matters, as is claimed, being subjects distinct from that embraced in the title. On this point we need add but little to what has already been said. The sanitary district is organized to construct a system of drainage which, in its results, will necessarily affect said rivers, canal and water-ways, and which therefore necessitates a proper adjustment of said water-ways to the altered condition of things which said system of drainage, when completed, will bring about. If the large volumes of water contemplated by the act are turned into the Illinois River, the river itself as well as the rights of the owners of riparian lands will be

more or less prejudicially affected throughout its entire length. The act would manifestly be incomplete in carrying out and perfecting the subject matter of the title, if it permitted the district to discharge the water flowing through the proposed channel into the Illinois River, and imposed upon it no duty to take proper steps for the protection of the river and the riparian lands against the necessary consequences of the largely increased volume of water. The provisions of the act conferring upon the district powers and imposing upon it duties in relation to the water-ways beyond the terminus of its own channel, were inserted for this purpose, and are therefore a part and a necessary part of the general system of drainage for sanitary purposes embraced within the subject expressed in the title.

Again, it is said that the act embraces a duplicity of subjects because, in addition to empowering the district to construct and maintain a channel of certain dimensions and capable of producing a flow of water of certain magnitude, for purposes of drainage, it declares the channel, when constructed, a navigable stream, and authorizes the district to make, establish, lease and control docks, and also to control and dispose of any water-power which may be incidentally created in the construction of said channel. The contention is, that three wholly independent and dissimilar subjects are here embraced, viz, the construction of a channel for purposes of drainage, the construction of docks for purposes of navigation, and the creation of a water-power for the purpose of driving machinery, and that the first of these only is expressed in the title of the act. It can not be doubted that a channel of the dimensions and capacity of the one the district is required to construct, when completed, will be capable of subserving all three of these purposes. It will be capable of carrying off the drainage and sewage from the district in such state of dilution by means of water drawn from Lake Michigan, as, according to the theory which the Legislature seem to have adopted at least, to be

rendered innocuous. A channel capable of doing this will, as a matter of necessity be sufficiently broad and deep to be capable of navigation by large vessels, and the fall from Lockport to Joliet is said to be such that the water flowing through said channel will be capable of producing a very large and important water-power.

But these circumstances alone do not sustain the contention that the act embraces a duplicity of subjects. It can not be said that because the channel, when constructed, will be capable of answering the purposes of navigation and the driving of machinery, those purposes also entered into the legislative intent, and that the scheme was undertaken with the view of constructing a navigable water-way and of creating a water-power, as well as that of promoting and preserving the public health by furnishing a suitable and efficient means of carrying off the drainage and sewage of the district. Bearing in mind the rule that every reasonable intendment should be in favor of the validity of a statute, and that every provision capable of it should receive the construction which will sustain the constitutionality of the act, there is, so far as this point is concerned, nothing in the act in question, if we except the provisions of section 7 which authorize the district to make and establish docks and to lease, manage and control the same, and to control and dispose of any water-power which may be incidentally created by the construction and use of said channel, and perhaps the provision of section 24 which declares the channel, when completed, to be a navigable stream, which will not clearly bear the construction of being referable solely to the subject of drainage for sanitary purposes. Such is the case with all those provisions which fix the locality, description, width, depth and capacity of the channel, and prescribe the rapidity of the current and the number of thousand cubic feet of water per minute which it shall be capable of carrying off. In other words, every provision of the act

38—133 ILL.

which relates to the construction and character of the channel and also those relating to the changes and improvements to be made in the Illinois River are all capable of being so construed as to refer solely to the subject of drainage, and that construction therefore is the one which they must receive. If then we entirely reject those provisions of section 7 which relate to docks and water-power, the act, so far as any question which can now be raised is concerned, remains wholly unimpaired. No provision which is vital to the organization of the sanitary district, or to the creation of the proposed drainage system is in the least affected.

Section 24, however, recognizes the obvious fact that the contemplated channel, when completed in such way as to accomplish in a satisfactory manner the purposes for which it is designed, will constitute a water-way capable of being utilized for purposes of navigation, and therefore declares what in the absence of such declaration would be the fact, viz, that, when so completed, it shall be a navigable stream. Section 7 also recognizes the fact that, as an incidental result, a large and valuable water-power will be created by the construction of the channel, and also that opportunities will be created for the construction along its course of valuable and remunerative properties by way of docks, and which may be made the source of considerable revenues. Assuming, as upon every recognized principle of construction we must, that the creation of these water-power and dock privileges is not the object or purpose of the act, still it is perfectly obvious that the accomplishment of that purpose will result incidentally in the creation of those privileges; and the question is, whether the district having, in the prosecution of its legitimate enterprise, brought these valuable privileges into existence, can utilize them as a source of revenue, for the purpose of paying the indebtedness incurred in the construction and maintenance of said channel and thus lighten the burden of taxation upon the property of the district. To answer this question in the negative would we think be

placing upon the incidental powers of municipal corporations a narrower construction than the rules of law require.

Can it be doubted that, if the authorities of the district, in the excavation of their channel, should strike a quarry of valuable building stone, that they would have the right, either with or without express legislative authority, to derive a revenue from the sale of the stone which in the pursuit of their legitimate objects, they are compelled to quarry? And if they should do so, would they expose themselves to the charge of embarking in the independent business of quarrying and dealing in stone? Clearly not. The power to dispose of property thus acquired so as to use the proceeds for legitimate corporate purposes would seem to be undoubted. And it would seem to be equally clear that the sanitary district having, as an incidental result of the prosecution of its corporate enterprise, created valuable water-power and dock privileges, will have a right to control and utilize those privileges for the purpose of raising a corporate revenue.

But it must be admitted that the power of the district to lease and control its water-power, and to construct, lease and control docks along its proposed channel, does not now arise, and can not arise until the channel is constructed and the district is in a position to exercise the power if it exists. Until then the question must be regarded as theoretical and not practical. Its existence or non-existence therefore is a matter aside from any question which the present litigation can legitimately raise.

A further point is based upon the language of the proviso in section 7, viz: "Provided, however, nothing in this act shall be construed to abridge or prevent the State from hereafter requiring a portion of the funds derived from such water-power, dockage or wharfage to be paid into the State treasury to be used for State purposes." It is said that this is unconstitutional because it compels the people of one class of municipal corporations to pay more than their share of the

burdens of the State Government, to the relief of the balance
of the State, and thus violates the principle of uniformity
required by section 1, of article 9 of the Constitution. The
answer to this point is obvious. The proviso does not attempt
to divert any portion of the revenues of the sanitary districts
to the State Treasury, but merely declares that the act shall
not be construed to abridge the right of the State to hereafter
require a portion of the funds to be derived from the wharfs,
docks and water-power to be paid into the State Treasury.
The effect of the act is to forbid a construction which would
make of the act an inviolable contract between the State and
the district by which the whole of the revenues of the docks
and water-power is irrevocably devoted to the corporate pur-
poses of the districts. It may well be doubted whether the
proviso can be said to have any force whatever, as the charters
of municipal corporations have never been held to be contracts
within the protection of the Federal Constitution.

Furthermore, the proviso is in no sense an exercise of the
power nor even an assertion of its existence, nor does it con-
tain the slightest intimation that the power, if it exists, will
ever be exercised. If then, as is contended, the exercise of
the power would be unconstitutional and void, a proviso which
merely abridges the right of the State to attempt to exercise
such void and unconstitutional power can have no legal force
or significance whatever.

As to the fourth proposition mentioned at the commence-
ment of this opinion upon which the constitutionality of said
act is assailed, viz, that it provides for cumulative voting at
the election of trustees of the sanitary districts organized under
it, we might well content ourselves with saying that no such
question necessarily arises upon this record. The third sec-
tion of the act provides that: "In all elections for trustees
each qualified voter may vote for as many candidates as there
are trustees to be elected, or he may distribute his vote among
not less than five-ninths of the candidates to be elected, giving

each of the candidates among whom he distributes the same the same number of votes or fractional votes." It will thus be seen that the right is accorded to each voter to vote for as many candidates as there are trustees to be elected, and that no voter is compelled to cumulate his vote upon less than the whole number. The defendants' plea, which is admitted by the demurrer, alleges that the defendants and Christopher Hotz received a majority of all the votes cast at the election, and there is nothing in the record which tends to show that any voters in fact cumulated their votes upon less than nine candidates for the office of trustee. As cumulative voting is not shown it can not be presumed.

But if the question were directly presented, we are unable to see how the provisions of said act can be held to be in derogation of any constitutional provision. Section 1, article 7, of the Constitution, provides, that every male citizen of the United States over the age of twenty-one years, and possessing the requisite qualifications as to residence, etc., shall be entitled to vote at elections, and section 2 provides that all elections shall be by ballot. We see nothing in these provisions in conflict with a statute which merely gives voters the option to cumulate their votes upon less than the whole number of candidates to be elected, so long as it leaves them free to vote for the whole number if they see fit to do so. If the act had made the cumulation of votes compulsory, a very different question would have been presented. In that case each voter would be deprived of the privilege of voting at the election of a part of the officers to be elected, and to that extent would be excluded from his constitutional right. The case would then be within the principle laid down in *State* v. *Constantine*, 42 Ohio St. 537, cited by counsel.

The point is made that the effect of the sections of the Constitution providing for cumulative voting in the election of representatives, (Art. 4, secs. 7 and 8) and in the election of directors of private corporations (Art. 11, sec. 3), is to deny

to the General Assembly power to authorize cumulative voting for any other purposes, upon the principle that the expression of one thing is the exclusion of another. This could be true only in the event that some provision of the Constitution required elections, generally, to be by a majority of persons voting, but can not be true where all the elective officers are named, and it is specifically provided how they shall be elected. In such case, the direction that each officer named shall be elected in a prescribed way, negatives that he shall be elected in any other way, but the negation can go no further, because the election to each office can be governed only by the restrictions applicable to that office. There is no provision of the Constitution requiring elections, generally, to be by a majority of persons voting, but in each article of the Constitution, certain officers are named, and as to those there are required to be elections, but as to other officers not named, there is no requirement or restriction in this respect.

And it has accordingly been held, that where an act of the legislature creating a municipal corporation has been adopted by a majority vote of the people of the district, it is competent to appoint the municipal authorities as therein provided, without submitting their selection to an election by the voters of the district. *The People* v. *Morgan,* 90 Ill. 558; *Cornell* v. *The People,* 107 id. 372. And so, on like principle, that drainage commissioners may be appointed or selected otherwise than by a majority vote of the district. *Huston et al.* v. *Clark,* 112 Ill. 349; *Owners of Lands* v. *The People,* 113 id. 296; *Blake* v. *The People,* 109 id. 504.

It must follow, that since there is no restriction upon the General Assembly in regard to the mode of election of drainage trustees, it was discretionary with it to provide for their election by cumulative votes.

Finally, it is said that the act is unconstitutional because, in providing the machinery for the organization of sanitary districts, it imposes upon the judge of the County Court and

two of the judges of the Circuit Court duties which are incompatible with their functions and duties as judges of those courts. The provisions which are here called in question are found in section 1 of the act, and are in substance, that after the proper petition for the organization of a sanitary district is filed in the office of the county clerk, "it shall be the duty of the county judge to call to his assistance two judges of the Circuit Court, and such judges shall constitute a board of commissioners which shall have power and authority to consider the boundaries of any such proposed district, whether the same shall be described in the petition or otherwise." It then provides for the meeting of the commissioners thus constituted, and requires that previous notice of the time and place of such meeting shall be published, and also provides that at such meeting the county judge shall preside; that all persons in the sanitary district shall have an opportunity to be heard touching the location and boundaries of the proposed district, and to make suggestions regarding the same, and that such commissioners, after hearing statements, evidence and suggestions, shall fix and determine the limits and boundaries of such proposed district, and for that purpose and to that extent may alter and amend the petition. It is then provided that after the determination by such commissioners, or a majority of them, the county judge shall submit to the legal voters of the proposed district the question of the organization and establishment of such district, as determined by the commissioners, at an election to be held on the first Tuesday after the first Monday in November thence next ensuing.

The constitutional objection to these provisions is based upon article 3 of the Constitution, which is as follows: "The powers of the government of this State are divided into three distinct departments—the legislative, executive and judicial; and no person, or collection of persons, being one of these departments, shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed

or permitted." It is said that if the foregoing provisions of the act imposed upon the county judge and the two circuit judges the performance of executive or ministerial duties, it is in conflict with the article of the Constitution last above cited, and that if said duties are judicial in their character, the act creates a new judicial tribunal unknown to the Constitution, and is therefore in conflict with section 1, article 6, of that instrument which exhausts all the judicial power of the State by dividing it among certain courts therein specifically enumerated.

It should be observed that the question presented here is not whether the county judge and the two circuit judges associated with him had a constitutional right to hold the office and discharge the duties of commissioners under said act, but simply whether the acts thus performed by them under color of office can now be called in question collaterally. If direct proceedings had been instituted to test their right to act on said commission, very different questions would have been presented. But they were at least commissioners *de facto*, and we see no reason why the familiar rule does not apply, that the acts of officers *de facto* are as valid and effectual where they concern the public or the rights of third persons as though they were officers *de jure*. *Sharp* v. *Thompson*, 100 Ill. 447; *Golder* v. *Bressler*, 105 id. 419; *Trumbo* v. *The People*, 75 id. 561; *Barlow* v. *Standford*, 82 id. 298; *Mapes* v. *The People*, 69 id. 523; *Pritchett* v. *The People*, 1 Gilm. 525.

But we are not prepared to hold that the duties imposed by said act upon said judges are necessarily incompatible with their duties as judges of the Circuit and County Courts. So far as the act commits to the County Court the political function of selecting the two judges of the Circuit Court who constitute the other two members of the commission, the principle is in no respect different from that involved in a variety of other cases in which statutes imposing analogous duties upon judicial officers have been held to be constitutional. Thus

the statute giving the Circuit Court of Cook county the power to appoint the commissioners for the South Park has been held to be constitutional. *People* v. *Williams*, 51 Ill. 63; *People* v. *Morgan*, 90 id. 558. So also the provisions of the drainage laws giving the County Courts the power to appoint drainage commissioners have been held valid. *Moore* v. *The People*, 106 Ill. 376; *Blake* v. *The People*, 109 id. 504; *Kilgour* v. *Drainage Commissioners*, 111 id. 342; *Huston* v. *Clark*, 112 id. 344; *Owners of Lands* v. *The People*, 113 id. 296. The same is true of those provisions of the Election Law of 1885, giving the County Court power to appoint election commissioners. *People* v. *Hoffman*, 116 Ill. 587.

Nor are the duties imposed upon said commissioners, when selected, necessarily incompatible with their duties as judges. As said by this court in discussing a similar provision of the Constitution of 1818: "It does not mean that the legislative, executive and judicial power should be kept so entirely separate and distinct as to have no connection or dependence, the one upon the other; but its true meaning, both in theory and practice, is, that the whole power of two or more of these departments shall not be lodged in the same hands, whether of one or many. That this is the sense in which this maxim was understood by the authors of our government, and those of the general and state governments, is evidenced by the Constitutions of all. In every one, there is a theoretical or practical recognition of this maxim, and at the same time a blending and admixture of different powers." *Field* v. *The People*, 2 Scam. 79. To same effect see, *Owners of Lands* v. *The People*, and *People* v. *Hoffman, supra.*

We may refer, by way of illustration, to those provisions of our statutes which confer upon judges the power to take the acknowledgment of deeds and to solemnize marriages, powers which, though non-judicial in their nature, have never been supposed to be incompatible with the judicial office. Section 31 of article 6 of the Constitution of 1870 makes it the duty

of the judges of courts of record to report, for the information of the Legislature, all such defects or omissions in the laws as their experience may suggest, and it has never been supposed that this provision was in any degree in conflict with section 3 which requires that the judicial and legislative departments shall be distinct from each other.

In this country, all corporations, whether municipal or otherwise, are created, either directly or indirectly, by legislative act, and it follows, therefore, that the creation of corporations belongs to the legislative department of government. But before the legislative power can be intelligently exercised in the creation of a municipal corporation, it becomes necessary for the legislative department, as a matter preliminary to its action, to be advised, in some mode, as to the proper territorial boundaries of the corporation which it contemplates organizing. For this purpose it may call to its aid any agency it may see fit to employ, but its doing so is no delegation of legislative power. The judges who are selected to constitute a commission for that purpose are no more vested with legislative functions, than are the judges of the several courts of record by the constitutional provision which requires them to report to the Legislature the defects and omissions they may discover in existing laws.

After giving to the record that careful examination which is demanded by the magnitude and importance of the interests involved in this and the other cases which we have considered together, we are of the opinion that in this case, the demurrer was properly overruled, and that the judgment dismissing the information was properly entered. Said judgment will therefore be affirmed.                                    *Judgment affirmed.*

Mr. JUSTICE MAGRUDER, dissenting:

At the March term, 1890, three cases were submitted to the Court, all involving the question of the validity of the act of 1889 entitled "An Act to create sanitary districts and to

remove obstructions in the Des Plaines and Illinois rivers."
One of these cases was assigned to me at that time, and being
unable, after a careful study of the act, to concur in the view
that it was a constitutional law, I prepared an opinion hold-
ing the act to be invalid, which was read to the other members
of the Court at the May term in Mount Vernon.    The fore-
going opinion of Mr. Justice Bailey written since the May
term does not satisfy me that the views then expressed were
wrong.    Such portions of the opinion so prepared and read
at Mount Vernon, as apply to the principal questions arising
upon the record in this particular case, are as follows:

Section 13 of article 4 of the constitution of 1870 contains
the following provision: "No Act hereafter passed shall em-
brace more than one subject, and that shall be expressed in
the title.    But if any subject shall be embraced in an Act
which shall not be expressed in the title, such Act shall be
void only as to so much thereof as shall not be so expressed."
The constitutions of many of the States of the Union contain
substantially the same prohibition as that embodied in the
first sentence of this provision, but fail to make the declara-
tion named in the second sentence.    At least twenty of such
States are mentioned by Cooley in his work on Constitutional
Limitations.    (5th ed. top pages 170, 171, note 4).    Some of
the States, among which may be mentioned Indiana, Oregon
and Iowa, have inserted in their constitutions some such sav-
ing clause as that expressed in the second sentence of the
above quoted provision.    Our constitution of 1848 did not
provide that only so much of a law as related to a subject not
expressed in the title should be void, and it limited the restric-
tion against embodying more than one subject in an Act to
private or local laws; section 23 of article 3 of that constitu-
tion contained these words: "no private or local law which
may be passed by the General Assembly shall embrace more
than one subject, and that shall be expressed in the title."

The constitution of 1870 went further than that of 1848 and provided that no Act, whether private and local or public and general, should embrace more than one subject. The enlargement of this provision when transferred into the new constitution adopted by this State in 1870, and its insertion in the constitutions of so many of the States, attest its necessity and its wisdom. It had its origin in the bitter experience to which the people had been subjected by vicious legislation. It was designed to furnish a remedy for serious defects in the existing methods of making laws. It was found that clauses, whose character was in no way indicated by the title of an Act, were often introduced into its body, and thus members of the legislature would be misled into supporting that which would have met with opposition if attention had been drawn to its real nature and effect. Furthermore, where two different subjects were inserted in a bill, legislators who approved of one but disapproved of the other, were oftentimes induced to vote for both in order to secure the passage of what was favored by them. This practice of bringing together in one Act several different measures, with a view to combine in their favor the advocates of each, often results in the adoption of a provision which could never succeed on its own merits. Such legislation has been said to be "both corruptive of the legislator and dangerous to the State." (*People* v. *Mahoney*, 13 Mich. 481).

The purpose of such a constitutional provision as section 13 of article 4 may therefore be stated to be "*first* to prevent *hodge-podge* or 'log-rolling' legislation ; *second*, to prevent surprise or fraud upon the legislature  *  *  * ; *third*, to fairly apprise the people  *  *  * of the subjects of legislation that are being considered."  *  *  * (Cooley on Cons. Lim. 5th ed. page 173.) Hence, the provision in question is mandatory, and in my opinion it is the duty of this Court to enforce it. (Id. pages 98, 180, 181).

Does the Act of May, 1889, embrace more than one subject? It contains general provisions for the creation of sanitary or drainage districts. Section 1 provides that "whenever any area of contiguous territory within the limits of a single county shall contain two or more incorporated cities, towns or villages, and shall be so situated that the maintenance of a common outlet for the *drainage* thereof will conduce to the preservation of the public health, the same may be incorporated as a sanitary district under this Act," etc. Then follow provisions for the organization of the district, for the election of trustees, for investing the district with the general corporate powers of a body corporate and politic, for the organization of the board of trustees who, as a board, are declared to be the corporate authorities, for the election of the officers of the board and the fixing of their salaries, for the passage, publication and proof of ordinances, etc.

The first clause of section 7 provides that "the board of trustees of any sanitary district organized under this Act shall have power to provide for the *drainage* of such district by laying out, establishing, constructing and maintaining one or more main channels, *drains*, ditches and out-lets for carrying off and disposing of the *drainage* (including the sewage) of such district, together with such adjuncts and additions thereto as may be necessary or proper to cause such channels or out-lets to accomplish the end for which they are designed in a satisfactory manner."

These and other provisions relate to the creation of Sanitary districts. Though called sanitary they are in reality drainage districts. Section 31 of article 4 of the constitution provides for the construction of "drains, ditches and levees for agricultural, *sanitary* or mining purposes." A drainage district may be organized for sanitary as well as for agricultural or mining purposes. The districts provided for in the Act of 1889 are formed for the purpose of securing sanitary results, but it is proposed to secure such results by means of channels or out

lets for drainage.    The end may be health, but drainage is the means.    The authorities, who are clothed by said section 31 with the power to "construct and maintain levees, *drains and ditches*" are the corporate authorities of drainage districts. The corporate authorities of the districts named in the act of 1889 are also clothed with the power to provide for drainage by constructing and maintaining drains, ditches, channels and outlets.    Such districts, possessing as they do all the features and characteristics of drainage districts, are none the less drainage districts because they are denominated sanitary districts.

But the Act in question, besides containing general provisions in regard to sanitary or drainage districts, contains also special provisions for the construction of a navigable channel or waterway from the waters of Lake Michigan into the Des-Plaines and Illinois rivers.

The last sentence of section 7 provides that the channels or outlets to be constructed may extend outside of the district, and that the trustees shall have the same rights and powers over the portion outside as over the portion inside of the district.    Section 8 permits the sanitary district to acquire, by purchase or condemnation, such property and right of way as may be required for its corporate purposes.    Section 17 authorizes the district to enter upon any public property or property held for public use, and to acquire the right of way over the same, and to "enter upon, use, widen, deepen and improve any navigable or other waters, waterways, canal or lake." Section 17 also permits a district organized under the Act to use so much of the Illinois and Michigan Canal as lies within the limits of the county in which the district is situated without compensation except for transportation purposes, but directs that no such district shall occupy any portion of said canal outside the limits of such county "for the site of any" "improvement, which any district is authorized by this Act to make," except to cross the same, etc.

Section 23 provides that "if any channel is constructed under the provisions hereof by means of which any of the waters of Lake Michigan shall be caused to pass into the Des Plaines or Illinois rivers, such channel shall be constructed of sufficient size and capacity to produce and maintain at all times a continuous flow of not less than 300,000 cubic feet of water per minute, and to be of a depth of not less than fourteen feet, and a current not exceeding three miles per hour," such portion of said channel, as shall be cut through a rocky stratum above a certain grade, to have double the flowing capacity above provided for "and a width of not less than 160 feet at the bottom capable of producing a depth of not less than 18 feet of water;" section 24 then declares, that, "when such channel shall be completed and the water turned therein to the amount of 300,000 cubic feet of water per minute, the same is hereby declared a *navigable* stream," etc.

It is true that section 20 requires any channel or outlet, constructed by any such district which shall cause the discharge of sewage into any river beyond the district, to be of such size, condition and flowing capacity, that "the water thereof shall be neither offensive or injurious to the health of *any* of the people of this State," but sections 23 and 24 provide, that any channel, made under the provisions of the Act which shall carry the waters of Lake Michigan into the Des Plaines or Illinois rivers, shall be of sufficient size and capacity to be *navigable*, independently of the question whether its water is or is not offensive or injurious to the health of any of the people. In other words, the channel, through which any of the waters of Lake Michigan are made to pass into the Des Plaines or Illinois rivers, must be made navigable, even though the size and capacity required to make it navigable may be greater than is necessary to prevent the sewage in the water from injuring the public health. Thus it appears that the authors of the Act had two distinct objects in view: one was to create sanitary districts; the other was to construct a water-way

from Lake Michigan, through the Illinois and Michigan Canal and the Des Plaines river, into the Illinois river, for the purposes of navigation.

The two-fold nature of the Act is further apparent from other of its provisions. Section 23 provides that "if at any time the general government shall improve the Des Plaines or Illinois rivers, so that the same shall be capable of receiving a flow of 600,000 cubic feet of water per minute, or more, from said channel, and shall provide for the payment of all damages which any extra flow above 300,000 cubic feet of water per minute from such channel may cause to private property, so as to save harmless said district from all liability therefrom, then such sanitary district shall within one year thereafter enlarge the entire channel, leading into said Des Plaines and Illinois Rivers from said district, to a sufficient size and capacity to produce and maintain a continuous flow throughout the same of not less than 600,000 cubic feet of water per minute with a current of not more than three miles per hour, and such channel shall be constructed upon such grade as to be capable of producing a depth of water not less than 18 feet throughout said channel, and shall have a width of not less than 160 feet at the bottom;" in section 24 it is then provided, that, "whenever the general government shall improve the Des Plaines and Illinois rivers for navigation to connect with this channel, said general government shall have full control over the same for navigation purposes, but not to interfere with its control for sanitary or drainage purposes."

The sanitary district named in section 23 is thus required to enlarge the channel constructed by it, not when drainage or sanitary necessities shall demand such enlargement, but when the general government shall improve the Des Plaines or Illinois rivers to a certain extent and shall provide for the protection of the district against any damages that may result from such enlargement. The object of thus enlarging the channel is to make it correspond in size and capacity with

the improvement to be made by the general government in the Des Plaines and Illinois rivers, and then to turn it over to the control of the general government for navigation purposes. The increase of the width and depth and flowing capacity of the channel for such a purpose as is thus indicated has no connection whatever with the subject of drainage or sanitary conditions. Navigation is one matter; drainage is another and entirely different matter. The distinctness of the two is shown by the language of section 24, which provides for the control of the channel by one jurisdiction for navigation purposes, and by another jurisdiction for sanitary or drainage purposes.

Section 23 also provides that a channel constructed in the Des Plaines river shall be of sufficient width and depth to carry the water down a certain slope between Lockport and Joliet; that the dam owned by the State near the first lock of the Illinois and Michigan Canal at LaSalle shall be removed by the Canal Commissioners in a certain contingency and under certain conditions; that "the district constructing a channel to carry water from Lake Michigan of any amount authorized by this Act may correct, modify and remove obstructions in the Des Plaines and Illinois rivers wherever it shall be necessary so to do to prevent overflow or damage along said river, and shall remove the dams at Henry and Copperas Creek in the Illinois river before any water shall be turned into said channel."

Section 27 provides that if a channel is constructed in accordance with said section 23, the trustees of the district shall notify the Governor; that the Governor shall appoint three commissioners to inspect said work, one residing at Joliet or between there and LaSalle, one at LaSalle or between there and Peoria, and one at Peoria or between there and the mouth of the Illinois river; that such commissioners shall meet within ten days at Chicago, and shall employ a civil engineer and other assistance, and shall make such examination and sur-

39—133 ILL.

veys of the Chicago river and of the channel authorized by the Act as will enable them to ascertain whether the channel is of the character and capacity required by the Act; that, "in case they shall find the work in all respects in accordance with the provisions of section 23," that is to say, of such size and capacity as are necessary to make the channel navigable, "they shall so certify to the Governor," etc.

Coming back to section 7 we find that, in addition to the powers of the trustees of the district which have already been mentioned, such trustees shall have power "also to make and establish docks adjacent to any *navigable* channel made under the provisions hereof for drainage purposes, and to lease, manage and control such docks, and also to control and dispose of any water-power which may be incidentally created in the construction and use of said channels or out lets," etc. The district, however, is not to control water after it passes beyond its channel into any river, or water power or docks on such river. It thus appears that, after the navigable waterway is finished, the sanitary district which constructs it is authorized to go into the business of building and managing docks "*adjacent to*" it, and of controlling and disposing of water power created by it.

It cannot be said, that making and leasing and controlling docks is subject matter which is germane to the creation of sanitary or drainage districts. The docks are incidents to the construction of the navigable water way. They are germane to the subject of navigation. Docks are for the use of vessels, boats and other water craft, and can exist only on water that is navigable. Section 9 authorizes the board of trustees of the district to borrow money for corporate purposes and issue bonds therefor to the amount of $15,000,000.00. Section 10, which directs them to levy an annual tax to pay the interest on this debt as it falls due, and the principal within at least twenty years, provides that "the net earnings from water power and docks may be appropriated and applied to the purpose of

paying the interest or principal of such indebtedness or both, and to the extent that they will suffice, the direct tax may be remitted."

But the business of earning money by means of docks and water power is not germane to the subject of creating sanitary districts simply because the Act permits the earnings from such business to be applied to the payment of the corporate debts. It might as well be said that a city, town or village can go into the dry goods or hardware business in order to make money to pay its debts. I conclude, therefore, that the provisions of the Act concerning docks and water power belong to the subject matter of those portions of the Act, which relate to the construction and maintenance of a navigable water-way, and must stand or fall with such subject-matter.

It will thus be seen that the Act of 1889 really embraces within its 27 sections two distinct measures. One is general, and relates to the organization, powers and operation of drainage districts in any or all of the counties of the State where there is an area of contiguous territory within the limits of a county, containing two or more incorporated cities, towns or villages, and having a common outlet, etc., as above specified.

The other measure is special and local. This is shown by the provisions already referred to and by the use of the words: Lake Michigan, Chicago River, Illinois and Michigan Canal, Des Plaines River and Illinois River. The second measure relates, as already stated, to a navigable water course between the waters of Lake Michigan and the mouth of the Illinois River, with docks and wharves along its banks. Such water course is to be constructed by a single sanitary or drainage district consisting of the city of Chicago and one or more of its outlying towns or villages, etc., located within the county of Cook. Of this it is necessary to take judicial notice, because the language used in the Act cannot possibly apply to any other locality. Counsel for appellees, in one of their briefs, admit that the Act has in view the two objects here

spoken of by the use of the following language: "The greater part of any outlet which may be constructed for the Chicago Sanitary District, under the provisions of the Statute, will lie outside of the territorial limits of the district, and it is required to be constructed, not with sole reference to the necessities of the district, but in part with reference to its possible adaptation for public uses as a *navigable stream.*"

Can there be any doubt that the act embraces more than one subject? Can there be two subjects more distinct and diverse in their character than a grand navigable waterway, built to float the inland commerce of this nation from the Lakes on the north through the Illinois and Mississippi rivers into the Gulf on the south, and drainage districts organized in the various counties of a single State for purely sanitary purposes?

Unquestionably the Act violates the constitutional mandate that "no Act hereafter passed shall embrace more than one subject." The question now arises, whether or not the provisions of the Act relating to one of the subjects named in it can be allowed to stand by excluding the provisions relating to the other subject, in accordance with the saving clause contained in section 13 of Article 4 of the constitution. That section requires that the one subject to be embraced in the Act "shall be expressed in the title," and then proceeds to say that, "if any subject shall be embraced in an Act which shall not be expressed in the title, such Act shall be void only as to so much thereof as shall not be so expressed." But what is to be the consequence, if the Act embraces two subjects and both of those subjects are expressed in the title?

It will be noted, that the title of this Act contains two parts. It is not only an act "to create sanitary districts," but an act "to remove obstructions in the Des Plaines and Illinois rivers." The first part of the title is general; the second part is local and special. Undoubtedly all those portions of the Act, which relate to the general subject of organizing sanitary districts,

naturally range themselves under the first part of the title. If the title of the Act was simply "An Act to create sanitary districts" and nothing more, then it would be easy enough if the Act were valid in other respects, to retain so much of it as provides for the creation of such districts, and declare so much of it as provides for the construction of a navigable stream to be void.     But is it not true that the provisions concerning a navigable water-way are expressed in the second part of the title, which designates the law as an Act "to remove obstructions in the Des Plaines and Illinois rivers?"     If the second part of the title covers and includes such provisions so that they must be regarded as being germane thereto, how can they be rejected or declared to be void?     It is only the subject that is *not* expressed in the title—not the subject that *is* expressed in the title—which can be declared to be void.

If each part of this title expresses a different subject, and if each of the two subjects embraced in the Act is expressed in one or the other of such parts of the title, then it would follow that the whole Act must fall.     The doctrine is thus stated in Cooley on Limitations (5th ed. top page 178): "But if the title to the act actually indicates, and the act itself actually embraces, two distinct objects when the constitution says it shall embrace but one, the whole act must be treated as void, from the manifest impossibility in the court choosing between the two, and holding the act valid as to the one and void as to the other."

I think that the second part of the title was designed to express the subject of constructing a navigable waterway as embraced in the body of the Act.     The popular understanding of the object of removing obstructions from rivers is to make them navigable, or to prevent interference with navigation already existing.     Such certainly is the meaning of much of the legislation of Congress in regard to rivers and harbors and navigable streams.     Moreover, the provision in regard to removing obstructions from the Des Plaines and Illinois rivers

is found in section 23 of the Act, and that section is the one that provides for the construction of a channel of such size and capacity as is necessary, by the terms of section 24, to constitute a navigable stream.

But I do not rest my opinion as to the invalidity of this Act solely and alone upon the fact that the two subjects embraced in it are expressed in its title. There are other and graver objections, which are set forth hereafter and in the dissenting opinion in *Wilson* v. *The Board of Trustees, supra.*

If it be admitted however that the Act in reality has but one title, that the second part thereof is a mere amplification of the first part, and that the removal of obstructions in the rivers in question is necessarily involved in the creation of a sanitary district, upon the theory that such removal is necessary to make a current strong enough to carry off the drainage and sewage, and thereby prevent injury to the public health, yet, even under this view, all that part of the Act that relates to the second subject embraced in it, that is to say, to the construction of a navigable water way and the building and managing of docks and water-power, together with all the provisions in regard to borrowing money or raising the same, by general taxation, or special assessments, for the purpose of constructing such a navigable waterway, or the docks thereon, or the water power therein, must fall to the ground as constituting a subject that is not embraced in the title.

The provision in section 7, which gives the State a right to require a portion of the funds, derived by a sanitary district from its water power, docks or wharfage, "to be paid into the State Treasury to be used for State purposes," is unconstitutional for another reason besides that already stated. It compels the people of one class of districts to pay more than their share of the burdens of the State government to the relief of the balance of the State, and thus violates the principle of uniformity required by section 1 of article 9 of the constitution.

The provision in section 1 of the Act as to the mode of appointing the board of commissioners, who determine the boundaries of the district, is unconstitutional.

Section 1 provides that 5000 legal voters resident within the limits of the proposed district may petition the county judge of the county in which they reside to cause the question to be submitted to the legal voters of such proposed district whether they will organize as a sanitary district under the Act. The petition must be addressed to the county judge; it must contain a definite description of the territory intended to be embraced in such district, and the name of the proposed district. Upon filing the petition with the county clerk, the county judge is required to call to his assistance two judges of the Circuit court, and such judges shall constitute a board of commissioners with power and authority to consider the boundaries of the proposed district "whether the same shall be described in such petition or otherwise." At the meeting of the board the county judge is to preside; all persons in the proposed district shall be heard touching its location and boundary and may make suggestions regarding the same; the commissioners, after hearing "statements, evidence and suggestions shall fix and determine the limits and boundaries" of the proposed district, "and for that purpose and to that extent may alter and amend such petition." After such determination by the commissioners "*or a majority of them,*" the county judge shall submit to the legal voters of the proposed district the question of its organization and establishment "as determined by said commissioners."

The petition is addressed to the county judge alone. It invokes the action of no one but the county judge. It must be filed in the office of the county clerk. The county judge is required to submit the question of organization to the voters. The county judge is to cause a statement of the result of the election to be spread upon the records of the county court. But the issues involved in the proceeding begun by the filing

of the petition are not to be determined by the county judge, but by another and entirely different tribunal, namely: a tribunal consisting of the county judge and two judges of the Circuit Court. The county judge does not exercise his own independent judgment upon the matters presented to him, but it is made his duty to call to his assistance two judges of a different grade, and having in most respects a different jurisdiction from that possessed by his own court. He may be deprived of any voice in fixing the boundaries of the district, because the two circuit judges, being a majority of the board of three, may overrule his views altogether. The circuit judges, instead of assisting him in his judgment, may substitute their own judgment for his.

The tribunal clothed with power to fix the boundaries must decide whether the proposed district contains an area of contiguous territory within one county, whether such area contains two or more cities, towns or villages, whether it is so situated that the maintenance of a common outlet for drainage will conduce to the preservation of the public health, whether all the territory in the proposed district is situated within the limits of a city, incorporated town or village or within three miles thereof. In determining these questions the tribunal must hear evidence, but it may fix boundaries for the district different from those named in the petition.

What is the nature of the duties thus imposed upon the county judge? Are they legislative, or judicial, or ministerial, or political, or administrative? If they are legislative, as amounting to the creation of a municipal corporation, they cannot be exercised by the county court, because, by section 3 of the constitution, "the powers of the government of this State are divided into three distinct departments—the legislative, executive and judicial; and no person or collection of persons, being one of these departments shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed or permitted." (*The City of*

*Galesburg* v. *Hawkinson*, 75 Ill. 152). If these duties are judicial in character the county court cannot delegate them, nor can the legislature authorize the county court to delegate them, to other parties. (Cooley on Cons. Lim. 5th ed. top page 506; *Hall* v. *Marks*, 34 Ill. 358; *Hoagland* v. *Creed*, 81 id. 506; 83 id. 601; *Meredeth* v. *The People*, 84 id. 479). If they are merely ministerial or administrative, they cannot be delegated, because where a court is compelled to perform a ministerial act, such act is so performed as an incident to the exercise of judicial power. (*Owners of Lands* v. *The People ex rel.* 113 Ill. 296).

But independently of the question of delegation of power, the judges of the Circuit Courts of this State cannot be called upon to perform official duties, whether of a judicial or ministerial character, at the beck and call of a county judge. Nor is there any authority in the constitution for the formation of a tribunal composed of a county judge and two circuit judges, acting together in the manner prescribed by this Act. Section 1 of Article 6 of the constitution provides that "the judicial powers, except as in this article is otherwise provided, shall be vested in one Supreme Court, circuit courts, county courts, justices of the peace, police magistrates, and in such courts as may be created by law in and for cities and incorporated towns." But the judicial power vested in a court of a certain class must be exercised by that court sitting alone, and not in combination with some other court of a different class. The constitution contemplates official action by the Supreme court as such, by the circuit court as such, and by the county court as such, and not by boards made up of members selected from these different courts, and especially when such selection is made by the judge of one only of such courts.

Certain duties, which are ministerial or administrative and not strictly judicial, are sometimes imposed upon courts. (*The People* v. *Morgan*, 90 Ill. 558; *Owners of Lands* v. *The People, supra.*) But in such case the court is one already ex-

isting and organized in a constitutional way. The legislature has no more right to create a new tribunal, by the fusion of existing judicial tribunals, for the performance of ministerial acts, than it has to form such tribunal for the exercise of judicial power.

By the provision now under consideration, the circuit judges who are to assist the county judge, are not even designated by the act itself, but their designation is left to the arbitrary dictation of the county judge. The county judge of a particular county may call upon any two judges residing anywhere in the State to come to his side to assist him in fixing the boundaries of a sanitary district. The constitution requires circuit judges to be elected by the people, supreme court judges to be elected by the people, county judges to be elected by the people, but the Act now under consideration assumes to authorize a county judge to create a judicial tribunal by his own fiat and independently of any action by the people. This provision of the Act violates the principle of uniformity required by section 29 of article 6 of the constitution, which provides that "all laws relating to courts shall be general and of uniform operation; and the organization, jurisdiction, powers, proceedings and practice of all courts of the same class or grade, so far as regulated by law, and the force and effect of the process, judgment and decrees of such courts, severally, shall be uniform."

Here, a certain class of duties, or a certain kind of jurisdiction, is imposed, not upon all circuit judges in the State, but upon such of them as may happen to be chosen by a county judge in a particular class of counties. It makes no difference that the act to be performed may not be altogether judicial in its character. It will not be contended that the appointment of a stenographer by a circuit judge is an exercise of strictly judicial power. And yet we held in *The People* v. *Rumsey*, 64 Ill. 44, that a law authorizing the appointment of stenographers by the circuit courts of Cook county, where the

other circuit courts of the State had no power to appoint such officers, was in violation of section 29 of article 6. It is contrary to both the letter and the spirit of the constitution to clothe a judge of a court of one grade or class with the authority to pick out judges of another grade or class, and assign them to the performance of duties of a particular kind, or call upon them to assist him in the performance of his own duties.