(No. 11893.—Reversed in part and remanded.)

THE SANITARY DISTRICT OF CHICAGO, Appellant, *vs.* ED-
WIN G. YOUNG, County Clerk, Appellee.

*Opinion filed October 21, 1918—Rehearing denied Dec. 4, 1918.*

1. SANITARY DISTRICTS—*public has a mere easement in channel
for purpose of navigation.* The channel and improvements below
the controlling works of the Sanitary District of Chicago are used
for the generation and sale of electric power for the benefit and
profit of the district, and the right of the public to use the channel
and improvements is a mere easement, with which the district is
burdened in order that it may enjoy the grants and privileges ac-
corded to it.

2. TAXES—*how value of property to sanitary district is to be
ascertained.* In ascertaining the value of the channel and improve-
ments of the Sanitary District of Chicago it is proper to consider
the cost thereof and depreciation by reason of age or obsolescence,
together with the earnings of the district from such channel and
improvements; but it is not proper to take out of consideration
any portion of said channel and improvements on the supposed
ground that it is of more aid to navigation than to the produc-
tion of power.

3. SAME—*what must be proved where excessive valuation is
charged.* Where a bill to enjoin the collection of a tax alleges
over-valuation of complainant's property by the fraudulent act of
the assessor, the complainant must prove such over-valuation and
also that it was made by the assessor from some corrupt, mali-
cious or illegal motive or that the assessment is so grossly exces-

sive as to amount to constructive fraud, and such proof must be clear and convincing.

4. SAME—*complainant must allege and prove diligence in having alleged over-valuation corrected.* Before a court of equity will enjoin the collection of a tax on the ground of over-valuation by the assessor, the complainant must allege and prove that it has been diligent in seeking to have such over-valuation corrected by the board of review or was prevented from pursuing such remedy by fraud, accident or mistake.

5. SAME—*when complainant is not required to pursue remedy before board of review.* Where a corporation has returned proper schedules to the assessor showing that it has no personal property in certain taxing districts but the assessor makes an assessment in disregard of such schedules, the corporation is not required to bring the matter before the board of review before pursuing its remedy by bill in equity for an injunction.

6. SAME—*fact that property is not used does not exempt it from taxation.* The facts that a Butterfly dam, erected by a sanitary district to protect people below it from danger, has never been used, is of no profit to the district and has no market value does not exempt it from taxation, where it is an essential part of the property of the district and is valuable for the purpose for which intended.

CARTER, J., dissenting.

APPEAL from the Circuit Court of Will county; the Hon. FRANK L. HOOPER, Judge, presiding.

EDMUND D. ADCOCK, (COLL McNAUGHTON, of counsel,) for appellant.

EDWARD J. BRUNDAGE, Attorney General, SNAPP, HEISE & SNAPP, and ROBERT W. MARTIN, for appellee.

Mr. CHIEF JUSTICE DUNCAN delivered the opinion of the court:

On the 11th day of September, 1915, the Sanitary District of Chicago filed its bill of complaint in the circuit court of Will county against Edwin G. Young, county clerk of said county, praying for an injunction perpetually enjoining him from extending the taxes upon and against its property in the townships of Lockport and DuPage, in said

.county, upon the valuations and assessments made by the assessors of said townships. Certain amendments were made to the bill on June 1, 1916, and on March 1, 1917. A demurrer, in form general and special, was filed to the bill. The court overruled the demurrer to the bill relating to the assessment of personal property in school district No. 97 in the town of Lockport, and as to that portion relating to the assessment upon the "power house and electrical machinery, appliances and water-wheels, lock and improvements of complainant" in section 27, in Lockport township, otherwise referred to in the record as improvements on appellant's property or right of way in section 27, in school district No. 90, in Lockport township. The court sustained the demurrer as to all other portions of the bill, and appellant electing to stand by its bill the court entered a decree in favor of appellee and against appellant as to such parts of the bill of complaint to which the demurrer was sustained. Appellee filed his answer to the remaining portions of the bill to which the demurrer was overruled, to which a replication was filed. On the hearing appellee admitted that in 1915, when the assessment in question was made, appellant did not own any personal property in school district No. 97 in Lockport township. Thereupon the court entered a decree perpetually enjoining appellee from extending the taxes upon the assessment against appellant for personal property owned by it in said school district. There was a trial before the court upon the other issues in the case, the same relating solely to the assessment of the improvements on the appellant's right of way in section 27. The court found the issues in favor of the appellee and against appellant and entered a decree accordingly, dismissing the remainder of the bill for want of equity. This appeal followed.

The improvements in section 27 are assessed, full value, at $4,748,115. The entire right of way of appellant and its personal property in Lockport township were assessed

at $431,475, making the total value of appellant's property in that township $5,179,590. Appellant charged fraud against the assessor in two particulars: (1) Over-valuation willfully and intentionally made; and (2) over-valuation so gross as to amount to fraud in law.

The Sanitary District of Chicago was organized under the act of May 29, 1889, "to create sanitary districts and remove obstructions in the Desplaines and Illinois rivers." As organized under said act it embraced about all of the city of Chicago north of Eighty-seventh street and almost forty-two square miles of Cook county west of Chicago, and was wholly within the limits of Cook county. The district was created for the purpose of preserving health by keeping pure the waters of Lake Michigan and by carrying off the sewage of the city of Chicago and vicinity. (*Sanitary District v. Martin,* 173 Ill. 243; *Sanitary District v. Gifford,* 257 id. 424.) In carrying out the objects of the legislation appellant constructed a main channel twenty-eight miles long southwesterly through Cook, DuPage and Will counties to the north line of section 22, the center of Lockport township, where a bear-trap dam and controlling works were erected, by means of which the sewage and water were permitted to drop into the Desplaines river. The main channel of appellant was finished in January, 1900, and was 200 feet wide through dirt and 160 feet wide through rock and from 22 to 24 feet deep. At the south end the channel was widened into what was termed a "windage basin," to permit boats to be turned, as that was the end of navigation. The south end of the channel was enclosed by a massive wall of rock and concrete, in the west side of which were located the controlling works. The Chicago river and the south branch thereof, from Lake Michigan to Robey street, in the city of Chicago, six and three-tenths miles, was widened and deepened in the same manner and connected with the channel at its upper end. The district was authorized to make and establish docks and to dispose of the same by

lease for its own benefit, as well as of any water power that might be created in the construction and use of the channel. (*Sanitary District* v. *Martin, supra.*) Appellant installed water-wheels near the controlling works, with which it developed some power for the generating of electricity, right after the original main channel was completed.

On May 14, 1903, the General Assembly passed an amendment to said act of 1889 which added to the original territory of appellant large territories on the north and south sides of the district and provided for the construction of drainage channels into said territories to be connected with the main channel, so that the same dilution of sewage through such auxiliary channels might be maintained, as required under the original act. The amendment also provided that appellant should connect its main channel from the controlling works at Lockport with the upper basin of the Illinois and Michigan canal at Joliet by a channel of a depth of not less than 10 feet and a width of not less than 160 feet throughout its entire length, and in said channel should provide and construct a lock or locks at least 22 feet in width and 130 feet in length between mitre sills, connecting the upper and lower levels, and should provide suitable protection for watercraft in using said locks and channels, and should provide for the State a site for suitable offices and buildings, not less than 20 by 30 feet. The canal commissioners were to have such authority in and about such locks as necessary to enforce the rules and regulations governing the Illinois and Michigan canal. Appellant was also to construct suitable roadways or approaches whereon to construct and operate docks, shops, barns and buildings used in connection with the operation and navigation of the Illinois and Michigan canal. Appellant was to permit all watercraft, without paying toll or lockage, to navigate all water channels of appellant promptly and without delay, under the rules of the United States government in force for regulating navigation on the Chicago river. Appellant was

also authorized by the said amendment to construct water-wheels and other works north of the upper basin of the Illinois and Michigan canal necessary to develop and make available water power in said main channel and auxiliaries and convert the same into electrical energy, and to transmit it and sell it to various cities and towns and persons within the district or on its channels.

The property involved in this case consists of a channel excavated through rock three and two-tenths miles long, 160 feet wide and 22 feet deep, enclosed on both sides by massive concrete walls and earth embankments, and which is connected with the south end of the main channel of appellant at the controlling works, in pursuance of said act of 1903. The "power house and electrical machinery, appliances and water-wheels, lock and improvements of complainant," assessed at $4,748,115, as aforesaid, are situated at the south end of the new channel. The power house is equipped with gates, through which the water is permitted to flow to wheels capable of developing 30,000 horse power. Below the power house and dam appellant excavated through solid rock a tail race one and one-tenth miles long and 160 feet wide, for the purpose of carrying the water from the wheels to the Desplaines river. By the joint operation of the water in the channel above and the tail race below the power house a 34-foot head or fall is created. On one side of the power house dam the sanitary district constructed a lock, as required by the act of 1903, to pass boats to and fro between the channel and the upper basin of the Illinois and Michigan canal. No water passes through this lock except for lockage and from seepage. Most all of it passes over the wheels for power purposes. To get the water to the wheels at the power house appellant broke out the rock and concrete walls at the south end of the original channel, thus diverting into the new power channel the water coming from Lake Michigan through the old channel and which before that time flowed into the Desplaines river.

Appellant failed to prove any over-valuation whatever of its improvements in section 27. Its contention is, that in assessing its power development property for taxation only the cost or value of the power house and the equipment in direct use for the production of power should be assessed, and that the cost or value of the channel, walls, one of the dams, and all other improvements not directly aiding in the production of power, should not be assessed to it, for the reason that, the channel being made navigable by statute, such improvements not directly aiding in the production of power are mere instruments for navigation purposes and should therefore not be taxed. Appellant's proof consisted solely and only in establishing the actual cost to appellant of those improvements aforesaid that it considered direct instruments or agencies in the production of power at the power house and the depreciation in value of the same by reason of age and obsolescence. After testifying to the cost price of all of said improvements that appellant considered as taxable, as aforesaid, its witnesses then proceeded to testify what per cent of such cost price should be deducted by reason of age and obsolescence, and stated the difference as the "sound value" of such improvements, and its witnesses thereby reached the conclusion that the sound value of such improvements on April 1, 1915, was nearly $1,000,000. The estimate of the witnesses so made varied from $905,366 to slightly over $1,000,000. The amount deducted by reason of depreciation of said improvements, including the depreciation for obsolescence, ranges from $300,000 to $350,000. The cost of the construction of the new channel or any part thereof, with a like deduction for depreciation, was not included in the estimate of appellant's witnesses in ascertaining what they termed the sound value of its property. The same is true as to what is referred to in the record as the 48-foot dam, constructed near the power house at a cost of $98,872.

The main purpose of the 48-foot dam is to maintain a proper and sufficient flow of water in the extension of the main channel, and the record evidence is to the effect that navigation of the channel from the old controlling works to the locks, and a large part of the power generated at the power house, would be destroyed if the dam were removed. It is apparent that the production of power and the maintenance of navigation from the controlling works down to the upper basin of the Illinois and Michigan canal would be impossibilities without the new channel there and its retaining walls and embankments. These two improvements are shown by the evidence to be just as essential to the production of power at the power house as they are for the purpose of navigation, and necessarily enter into the class of improvements that are to be considered in ascertaining the value of improvements there for assessment purposes. It is furthermore very apparent that the cost of appellant's improvements in question as a whole, less the usual and customary discount for depreciation by age and by obsolescence, would not be any safe criterion as to the value of such improvements for assessment purposes or for any other purposes. The cost, and a like depreciation for a portion, only, of such improvements, most certainly cannot be taken or accepted as proof of value of said improvements for assessment purposes. Our conclusion must therefore necessarily be that appellant's claim that its evidence shows the full value of its improvements to be around $1,000,000 is not sustained. This is further apparent from the testimony of its witnesses showing the gross and net earnings of appellant from electrical power generated by its power house and by it sold to its customers. Its expert witness, Gardner S. Williams, testified that the gross income from the sale of electric current for the years 1914 and 1915 was practically the same, and that for the year 1915 it amounted to $969,462.83; that the annual charges for operation, maintenance, interest, taxes and depreciation for

the same year were $690,708.70, leaving a net income or surplus of $268,754.13 after deducting $10,000 for steam power, which had been included in the total income. This sum of $268,754.13 is five per cent of $5,375,082.60. In the case of *Sanitary District* v. *Gifford, supra,* the appellant made the contention that the proper method of arriving at the assessable value of its property for the year 1911 in the township of Lockport was to determine a fair percentage of returns on the basis of its net income, and that five per cent was a fair percentage on such returns. The evidence also shows the following facts: In 1915, at the rate given to other municipalities than the city of Chicago, the appellant absorbed electric power for the operation of its bridges and lighting the locks of the value of $2500. In the same year the city of Chicago used almost half of the electric power generated by appellant, and the power was sold to it at a loss by reason of the fact that the basis of the charge was fixed with reference to the cost of the improvements for producing power, such cost being determined by including only such improvements as are claimed by appellant in this case to be the only ones properly to be included in ascertaining the value for assessment purposes. Such loss to appellant on the Chicago contracts is estimated by its own expert witness at $40,000 per year. The showing in the record is that had it sold to Chicago at cost price its electric power its profits would have been about $40,000 more than the above estimate, and that in addition to such profits it had the use of $2500 of its power for its own purposes, and that all of this income was realized on about one-half of the electric power produced at its power house.

The channel and the improvements below the controlling works are used for the generation of electric power for the benefit and profit of appellant. That channel and all the improvements are essential, more or less, to the production of such power. Their creation was solely for the benefit

of appellant and the people in the district. The public has no right to the use of any of such construction except for the purposes of navigation. The public has a mere easement in the channel and its improvements for the purposes of navigation. The new channel and the improvements therein are all taxable in the townships of Lockport and DuPage, as has been previously determined by this court. (*Sanitary District* v. *Martin, supra; Sanitary District* v. *Hanberg,* 226 Ill. 480; *Sanitary District* v. *Gifford, supra.*) The public's right to free navigation of the channel was exacted of appellant because of the destruction of the Illinois and Michigan canal for navigation purposes from Joliet to Chicago by reason of appellant's constructions across it, and is a burden cast on appellant by the acts of the legislature, and which burden it has to assume so as to have and enjoy the grants and privileges in those acts that are beneficial and profitable to it. In arriving at the full value of appellant's property for assessment purposes it would be proper to take into consideration the necessary cost to appellant of constructing the channel and the improvements and of their depreciation by reason of age or of obsolescence. It would also be proper to take into consideration the gross amount of earnings of appellant, less the annual charges for operation, maintenance, interest, taxes, etc., and of all other matters that would affect the cash value of the channel and of the improvements. It would not be proper to take out of the consideration any one of the improvements upon the supposition that it is more of an aid in navigation than in the production of power. The cost of the channel and of the improvements, less depreciation for any reason, as already shown, cannot be accepted as the cash value of the channel and its improvements. We do not wish to be understood as holding that the full value of appellant's improvements is to be obtained by ascertaining the net earnings of the appellant and placing the full cash value of its property at a sum five per cent of which would equal such

net earnings. In other words, we do not wish to be understood as deciding what would be a fair return on appellant's property. That is a matter that rests in proof. However, a showing of the net earnings of appellant is evidence tending to show that appellant's property is valuable and how valuable. It must be conceded, generally speaking, that the fair cash market value of property depends upon the amount of earnings that property will net for its owner when employed to its capacity or to the capacity that its patronage will insure. Other factors may enter into the calculation of value, but we have no hesitancy in saying that the evidence in this record does not show over-valuation of appellant's property, as charged in its bill.

Inasmuch as appellant failed to prove the value of its improvements and thereby failed to prove that the improvements were assessed in excess of their actual value its case must fall. Excessive valuation was charged by appellant, and, no matter how malevolent the motive of the assessors in Lockport and DuPage townships may have been in making the assessment, it was incumbent upon the appellant to prove excessive valuation of said improvements by the assessors to maintain its case. In reaching this conclusion we have in no way considered appellant's witnesses as having been discredited or as having been shown unworthy of belief in any particular. On the contrary, we think the record shows that they were absolutely fair and truthful in giving their testimony. The failure of appellant's proof is attributable solely to the incorrectness of its theory in arriving at the fair cash value of the property and its improvements. The record, however, does not prove any wrongful or illegal motive on the part of the assessors in making the assessment. The assessor in Lockport township, Sloan, was very courteous to appellant, as shown by the letters that passed between him and it regarding the assessment, he giving it all the time asked in making its return of the property assessed in the said township and in

furnishing to him the descriptions of its right of way, etc. The testimony of Sloan is convincing that he made the assessment in question honestly and fairly, and that he valued the improvements in question according to the best of his information and belief and after using his utmost diligence in finding out what was such fair cash value. He undertook by letter addressed to appellant to ascertain its net earnings for power generated at the power house and sold by it. He was unable to obtain this information from appellant, and had to obtain it, as best he could, from other sources. He informed it, in substance, by letter, that he understood from its representatives that the value of the property for assessment purposes should be found by capitalizing the net income therefrom, and that he believed such an assessment would be just and satisfactory to all parties concerned and would possibly avoid litigation. He testified that he examined the case of *Sanitary District* v. *Gifford,* and understood therefrom that that was the proper method of assessing appellant's property; that by his efforts he ascertained that the returns of appellant's power plant for the year 1914 for power sold, other than that sold to the city of Chicago, showed net earnings of $258,979.50, which was five per cent of $5,179,590. He therefore valued the improvements in question at the sum of $5,179,590, less the sum of $431,475, the latter being the amount at which the personal property and the land without the improvements were assessed by him. The testimony of the witnesses for appellant shows clearly that Sloan's estimate of the net earnings of appellant for 1915 was even less than they actually were.

The only evidence in the record introduced by appellant for the purpose of showing that there was an intentional or fraudulent over-valuation of its property in Lockport township, outside of the assessment itself, was, first, the fact that the assessor, Sloan, had expended the sum of $540 of his own money to obtain evidence before the board of review

to sustain his assessment for the year 1911, and for which he was afterwards reimbursed out of township funds. He had assessed the property of appellant in Lockport township for that year at about $5,000,000. He was notified by the board of review to appear and defend his assessment against the charge that it was excessive. It was his statutory duty to appear and show in what manner and on what theory he had assessed the property. It was his right to produce before the board any legitimate evidence that tended to support his assessment. We do not regard any amount of zeal put forth by the assessor to· sustain his assessment as evidence tending to prove malice or bad motive, so long as his acts are not dishonest or otherwise shown to be unfair or disreputable. No such showing is made in this record. He was re-paid by the town clerk the amount he had thus paid out. The suggestion that he might have obtained such evidence at a less cost, or even free, by applying to appellant, if true, merely suggests a cheaper way of doing the same thing but does not necessarily show evidence of bad faith or corrupt motives on the part of the assessor. The second bit of evidence offered to prove bad motive on the part of Sloan was a campaign letter circulated in the year 1912, when he was a candidate for the office of auditor of the county of Will. He appealed to the voters in that circular letter for their support upon the ground that he had saved the tax-payers of Will county, while assessor of the town of Lockport, the sum of $11,000 a year in the assessment of the sanitary district. We have examined this letter carefully, and whatever might be said as to the propriety of a candidate for office circulating a campaign letter of the character of the one in question, we can see no reason for reaching the conclusion therefrom that the assessor was guilty of malice or fraud or illegal motive in making the assessment in question. There is not a suggestion in the record that he assessed appellant's property at a higher rate in the two years preceding 1912 than he did the property of other tax-

payers or that he assessed it excessively. We cannot infer from any wording of that letter that his assessments were dishonestly or corruptly made or that they were even excessive. The letter simply contains some rather vain boasting of what he had done for the tax-payers of the township, without even a suggestion of any violation of his duty. The letter is the only evidence bearing upon his motive or upon the character of his assessments for those two years, and one of those assessments, as we understand it, was sustained in the case of *Sanitary District* v. *Gifford, supra.* Under the theory of appellant's bill it was not only necessary to prove over-valuation, but that such over-valuation was made by the assessor from some corrupt, malicious or illegal motive, or that the assessment appears to be so grossly excessive as to amount to constructive fraud. A court of equity will not interfere by injunction except where such fraud is charged and fully proved. (*Sanitary District* v. *Gifford, supra; First Nat. Bank* v. *Holmes,* 246 Ill. 362; *Sanitary District* v. *Board of Review,* 258 id. 316.) The presumption is always indulged in such cases that the officers making the assessments have properly discharged their duties. The proof of fraud and of discrimination must be clear and convincing to warrant interference by a court of equity in matters of taxation. *Sanitary District* v. *Gifford, supra; People* v. *Bates,* 266 Ill. 55.

The portions of the demurrer of appellee sustained by the court attack the assessment of the Butterfly dam, of the appellant's real estate situated in the townships of DuPage and Lockport, and of its personal property situated in certain school districts in said townships, which will be referred to in this opinion in two separate groups.

The Butterfly dam is described in the bill as situated in the center of the new channel below the controlling works, and is so constructed that it can be swung at right angles and thereby prevent the flow of water to any point below it. It was constructed to safeguard persons residing on the

lower levels, is not a source of revenue to appellant and has not been used since its construction. It is charged in the bill that it is corroded and has depreciated in value; that it has no fair cash market value and did not have in the year 1915; that it was built in 1907 at a cost of $220,155.76, and that the assessor in Lockport township with an unlawful and fraudulent purpose found its full fair cash value to be $241,410,—more than $88,000 in excess of its value for any purpose.

The charge as to appellant's real estate in DuPage township is that a portion of it is submerged by the Desplaines river and the prism of the new channel, and that the land not submerged by water is low pasture land and has no value for any other purpose; that the assessor assessed the submerged land at one-third more per acre than he did high-class, well improved farm land in its vicinity, and the other land at fifty per cent in excess of its actual fair cash market value, without using his honest judgment and with a fraudulent intent, etc. The charge in the bill as to the land in Lockport township is in all respects similar to the charge against the assessment of land in DuPage township.

The substance of the charge as to the personal property in school district 90 in the township of Lockport is, that appellant returned schedules to the assessor, duly verified and sworn to, of all of its personal property owned, possessed or controlled in the year 1915 in said district, which showed personal property (old machinery) of the value of $2480, and that the same was all the personal property it had in such district; that the assessor afterwards, in furtherance of his fraudulent and wicked purpose, increased the value of said old machinery in his valuation and valued the same at $3000.

The substance of the averments of the bill as to the second group, the personal property in school districts 89 and 91 in the township of Lockport, and in school districts 98, 99 and 103 in the township of DuPage, is, that on the first

day of April, 1915, appellant presented its schedules of all
its personal property, of every kind, name, nature and char-
acter, in each of said five school districts and in other school
districts; that said schedules so prepared were duly signed
and sworn to by an officer of appellant in due form of law,
and that they contained full and correct descriptions of the
location, kind and character of the property by it owned,
possessed or controlled in either or all of said school dis-
tricts; that appellant did not on said date, nor at any time
prior or subsequent thereto, own, possess or control any per-
sonal property, of any kind, name, nature or character, in
said school districts, and did by its schedules so return to
the assessors of said townships; that said schedules so made
out and returned to said assessors were accepted by them
without any objection made thereto; that notwithstanding
said facts the assessors, with the intent and purpose of com-
pelling appellant to pay, by way of taxes, to the residents of
said townships, moneys to which the people were not en-
titled, either as a township or county, did assess alleged per-
sonal property as that of appellant in said school districts,
and that the valuations placed upon said property by the
assessors were the following: In school district 89, $1420;
in school district 91, $1146; in school district 98, $27,250;
in school district 99, $24,210, and in school district 103,
$12,090. It is further averred, in substance, that appellant,
with a view of ascertaining what personal property the as-
sessors had concluded or determined that appellant owned
in said school districts, caused to be made an exhaustive
research and examination of the books returned by said
assessors, and that the only information obtainable there-
from is that the personal property so assessed in said school
districts is described in each and every instance, in sub-
stance, as "personal property owned by the sanitary dis-
trict," followed by the amounts purporting to represent the
fair cash value thereof, which were placed in the proper
columns, and that appellant was unable to obtain from said

books any other or further information concerning the property so assessed to it in said school districts. The other averments of the bill pertaining to such property are unquestioned by appellee as to their sufficiency.

A court of equity has jurisdiction to enjoin the collection of a tax, or the extension of a tax on property that is by the assessor fraudulently valued too high, only where the injured party has been diligent for his own protection. (*New Haven Clock Co.* v. *Kochersperger,* 175 Ill. 383.) The sum and substance of the charge of appellant in its bill as to all of the property described or above referred to in the first group is that the assessor fraudulently valued it too high, and this is the ground upon which it asked the. lower court to interfere by injunction with the extension of taxes against such property on such valuations. The averments in respect to those properties are manifestly insufficient for want of allegations showing any diligence whatever in having the over-valuation corrected by the board of review. It is even disclosed by the allegations of the bill with respect to its personal property above referred to, that appellant before the filing of its bill had thoroughly examined the assessors' books and was cognizant of all that those books disclosed with reference to the assessment of its property. It was required, as a matter of law, to acquaint itself with any action of the assessors in assessing any property owned by it and subject to taxation, and is therefore chargeable with constructive notice of any increase by the assessors in the valuation of its personal property. (*New Haven Clock Co.* v. *Kochersperger, supra.*) Paragraph 329 of our statute on revenue gave appellant ample remedy to have its assessment, if excessive, whether made by the assessors fraudulently or otherwise, corrected before the board of review. The powers of the board of review in that regard are in that paragraph set forth as follows: "Fourth, on complaint in writing that any property described in such complaint is incorrectly assessed, the board shall review the

assessment, and correct the same, as shall appear to be just. * * * Fifth, increase or reduce the entire assessment of either real or personal property, or both, * * * if in their opinion the assessment has not been made upon the proper basis."

It has been frequently declared by this court that it is the policy of our law that the whole matter of the valuation of property for taxation shall be committed to the control of the assessor, the board of review and the board of supervisors of the respective counties, and that a party aggrieved by an excessive valuation, fraudulently or otherwise made, should apply to the board of review for a correction of the assessment. The statutory provisions concerning the tax-payer's right to have the assessor's valuation of his property for taxation reviewed by the board of review are intended to provide adequate protection against fraudulent or excessive assessments of every kind and character. If the board for any reason refuses to give him a hearing he may apply for *mandamus* to compel the board to act. (*New Haven Clock Co.* v. *Kochersperger, supra; Beidler* v. *Kochersperger,* 171 Ill. 563.) It is true that the remedy against fraud is of an equitable character, but it should only be applied where the party injured has been diligent to protect himself against such fraud, where, as in this case, he has an ample statutory remedy that he may invoke without taking the long course by a bill in equity. A court of equity, when resorted to in a case like this, cannot make a just and equitable assessment and determine the amount of taxes ultimately to be paid. It can defeat such a fraudulent assessment but cannot make or substitute an equitable or just assessment in the place of the fraudulent one. So by resorting to a court of equity without exhausting his legal remedy, a tax-payer, if he were so permitted to do, might unnecessarily delay the public in collecting the taxes justly due it for months and even years. It is therefore not too much to require a party seeking a remedy by injunc-

tion against an excessive assessment fraudulently made, by proper allegations in his bill, to show that he has been diligent in pursuing his remedy before the board of review to have such assessment corrected, or that he was prevented from having the benefit of such legal remedy by fraud, accident or mistake. For failure to make such a showing the bill would be properly held subject to demurrer. This practice is well supported by Story on Equity Pleadings. Section 473 of that work contains the following language: "In general, courts of equity will not assume jurisdiction where the powers of the ordinary courts are sufficient for the purposes of justice, and therefore it may be stated as a general rule, subject to few exceptions, that where the plaintiff can have as effective and complete a remedy in a court of law as in a court of equity, and that remedy is direct, certain and adequate, a demurrer, which is in truth a demurrer to the jurisdiction of the court, will hold."

The charge as to the personal property, as shown in the second group of allegations heretofore referred to, is, in short, that appellant was assessed for personal property in the various school districts, when, as a matter of fact, it had no personal property of any kind or character in said school districts on April 1, 1915, and never had such property before or since that date, and that the assessors were by proper schedules well informed of those facts before assessing such property. After giving such information to the assessors appellant had no reason whatever to suppose that they would make any assessment against it for personal property supposed to be owned by it in said school districts or controlled by it, and which, in fact, it did not own, possess or control. It had a right to assume that the assessors would respect its rights and obey the law and make no assessment against it on property that it did not own, possess or control. It was required to do no affirmative act, other than the presenting of said schedules to the assessors, to prevent its being assessed for property in said

285 — 24

school districts that it did not own, possess or control. The same rule is applicable in a case of this kind as where a party is assessed and taxed for property that is exempt from taxation or where he is taxed and assessed by parties having no power or authority to assess the property, or where the assessing and taxing officers assess and tax property that is not in their territory or jurisdiction. In all such cases the aggrieved party has his remedy by injunction to enjoin the assessment and collection of such taxes, although he also has an adequate remedy to be relieved from such assessment before the board of review. The two remedies are cumulative, and the party so aggrieved may pursue either remedy,—the one by injunction or the one by applying to the board of review. The only limitation in such cases is, that where he elects to pursue the remedy before the board of review he will not be allowed to abandon it and then go into equity, but he may go into equity in the first instance and have relief. (*Illinois Central Railroad Co.* v. *Hodges,* 113 Ill. 323; *School Directors* v. *School Directors,* 135 id. 464; *Searing* v. *Heavysides,* 106 id. 85; *First Nat. Bank* v. *Holmes, supra; Moline Water Power Co.* v. *Cox,* 252 Ill. 348.) One of the reasons for a court of equity entertaining jurisdiction in such cases is, because the acts of the assessor or of the taxing authorities are unauthorized by law,—*i. e.,* their acts are concerning property over which they have no jurisdiction.

For the foregoing reasons the appellant was entitled to a hearing on its bill so far as it related to the second group of properties, the personal property in school districts 89, 91, 98, 99 and 103, and the court erred in sustaining appellee's demurrer thereto.

The bill does not disclose any sufficient ground for the contention that the properties described in the first group, or any part of them, are exempt from taxation. As heretofore said, all of them are taxable in said townships. The Butterfly dam, as shown by the averments in the bill, serves

a useful purpose or may do so. The fact that it has never been used is no reason for exempting it from taxation. The object and purpose of this dam are to guard and protect people below it from a danger that we are warranted in assuming may arise, as it would not have been built by appellant at such a cost if there were no probability that it would serve its purpose. The fact that it has been no source of revenue, that it has never been used for its purpose or that it has no fair cash market value are not good reasons for saying that it is not taxable. The same might be said about guards to dangerous machinery, to protect persons from being injured thereby. They are no source of income within themselves and might not be salable to others, yet they nevertheless serve their purpose and are valuable to the owner and enter into a material part of the value of the machinery, although they may never, in fact, guard anyone against injury. To be without them might subject the owner at any time to a successful suit for damages by someone injured by the machinery. It is too clear for argument that such a structure as the Butterfly dam is an essential part of appellant's property used for the production of power, and that it is valuable to appellant for the purpose for which it was intended and therefore not exempt from taxation.

The decree of the circuit court sustaining the demurrer to the allegations of the bill attacking the assessments on personal property in school districts 89, 91, 98, 99 and 103 is reversed but the decree is in all other respects affirmed and the cause is remanded.

*Reversed in part and remanded.*

Mr. JUSTICE CARTER, dissenting: I do not think the Butterfly dam is assessable.