(No. 27463.—▇▇▇▇)

THE SANITARY DISTRICT OF CHICAGO, Appellant, *vs.* IVAN R. RHODES, County Collector, Appellee.

*Opinion filed March 21, 1944.*

ERNEST BUEHLER, of Chicago, THOMAS F. DONOVAN, of Joliet, and BARR & BARR, of Joliet, for appellant.

JAMES E. BURKE, State's Attorney, CHARLES H. BLIM, both of Joliet, and GLENN E. MILLER, of Lockport, for appellee.

Mr. JUSTICE FULTON delivered the opinion of the court:

This case involves an old tax question complicated by modern developments. Specifically, the Sanitary District

of Chicago very earnestly contends that its main channel prism in Du Page and Lockport townships, Will county, was not taxable in 1940, because it had come to be public property used exclusively for public purposes. Issue on the point was raised by a suit to enjoin the defendant from making application for judgment on the taxes as extended for that year, or otherwise instituting any proceeding to collect the same. In lieu of a temporary injunction without bond the parties stipulated that all matters would remain *in statu quo*, and without prejudice, until final decision. Upon taking a large amount of testimony and after a very extensive hearing, the trial court entered a decree dismissing the amended complaint for want of equity. Revenue is involved whereby the appeal comes directly to this court.

On the part of appellant it is argued that the protective cloak against taxation has arisen from, (1) use of the channel for sanitary purposes by communities and the public at large outside the corporate limits of the Sanitary District, and, (2) conversion of the channel to a navigable interstate waterway, particularly since 1930, when the Federal government assumed certain directive powers and control. The first of these reasons was urged as early as 1898, but decided adversely in *Sanitary District* v. *Martin*, 173 Ill. 243. Navigation was hinted at in the same case and pointedly denied in the later decision of *Sanitary District* v. *Young*, 285 Ill. 351. However, the record now before us shows a somewhat changed state of facts and the tax is for a different year, so those cases are not conclusive herein. See *People ex rel. Carr* v. *Sanitary District*, 307 Ill. 24.

The frame of appellant's complaint, its proof in the court below, and the theory upon which the case has proceeded require that we first review some historical facts as a background. As early as 1673, Father Marquette and Louis Joliet suggested that a navigable waterway be built

from Lake Michigan to the Des Plaines river which joined with the Illinois river which in turn emptied into the Mississippi so that water transportation might be had from the Great Lakes to the Gulf of Mexico. In 1808, Albert Gallatin, Secretary of the Treasury, urged upon the United States Senate the construction of such a canal thus giving access to the sea *via* the same waters. After one act failed to produce results because no funds were available, the Congress of the United States passed an act on March 2, 1827, granting the State of Illinois alternate sections of land extending five sections wide on each side of a proposed canal which would connect the waters of Lake Michigan with the Illinois river. See copy of act at beginning of chapter 19, Ill. Rev. Stat. 1943.

With proceeds from the sale of 284,000 acres of land thus granted, work was commenced on the famous Illinois and Michigan canal which was completed in 1848. It extended from a point on the left bank of the Chicago river near Ashland avenue southwesterly to Joliet, thence across the Des Plaines river and down the right side of it and the Illinois river to LaSalle, a total distance of ninety-six miles. It was thirty feet wide at the bottom, six feet deep and had fifteen locks. The canal was originally designed to obtain its water supply by gravity from Lake Michigan. However, the divide between the Great Lakes and the Mississippi watersheds followed a line parallel to and some fifteen miles west of Chicago and in order to effect a flow by gravity it would have been necessary to cut the canal to a depth of at least fourteen feet. To save expense incident to such construction, the canal was, in fact, built on the summit level which was eight feet above Lake Michigan. Accordingly, water was furnished at Ashland avenue by pumps which were subsequently increased in numbers and capacity.

Within twenty years after the completion of the Illinois and Michigan canal it became apparent that the same was

inadequate and more than one chief of engineers of the War Department so reported. However, this inadequacy was not entirely with respect to navigation. The record shows that soon after the Illinois and Michigan canal was built it began to serve the rapidly growing city of Chicago as a sanitary outlet *via* the pumps at Ashland avenue which were taking water from the Chicago river into which most of the city's sewage drained. There were no sewage disposal plants in existence until after the turn of the century and the only treatment prior thereto was indirectly by dilution of the waters of the Chicago river or Lake Michigan into which considerable sewage also drained. The capacity of the canal was small and its current slow whereby it was inevitable that obnoxious and unhealthful conditions would arise on the lake front, throughout the length of the canal, and even in the communities of the Mississippi valley. The water was foul and sewage in an undecomposed, putrid mass floated in Lake Michigan or moved slowly along the canal into the Des Plaines, thence into the Illinois, thereby causing the air to be impure and exceedingly offensive and spreading disease broadcast through the entire Des Plaines and Illinois valleys. In the meantime, the original canal had filled to some extent and development of larger boats made it less useful as a waterway.

Public outcry culminated in the passage of the Sanitary District Act by the Illinois legislature on May 29, 1889. The district originally encompassed the city of Chicago down to Eighty-seventh street together with a few adjoining communities. The act was declared constitutional and the district held to be a municipal corporation in the cases of *Wilson* v. *Board of Trustees,* 133 Ill. 443, and *People ex rel. Longenecker* v. *Nelson,* 133 Ill. 565. As first completed in 1899, the main channel extended from the south branch of the Chicago river at Damon avenue, southwesterly between the old Illinois and Michigan canal

on the east and the Des Plaines river on the west, a distance of about thirty miles to a point near the northwest corner of Lockport in Will county. It then ended at what was known as the controlling works which was simply a blank wall, but by means of sluice gates and a so-called bear-trap dam the flow was diverted over into the Des Plaines river immediately to the southwest. Minimum requirements of the act as to depth and capacity were somewhat exceeded so that said channel was, in fact, approximately 165 feet in width at the bottom and about 20 feet in depth, part of which was excavated and the remainder enclosed within walls or embankments. This was done to assure a gravity flow up to three miles per hour without regard to the summit level and thereby eliminate one major fault of the old Illinois and Michigan canal. It was known that such construction would result in reversing the flow of the Chicago river because that phenomenon was observed during dry weather of previous years when pumpage into the Illinois and Michigan canal was heavy; thus, an almost unlimited supply of water for dilution of sewage would surely be available. Water was first admitted to the main channel on January 2, 1900, and it was placed in full operation on January 17, 1900.

Marked improvement in sanitary conditions from the lake front to the Mississippi soon followed and thus it became desirable to extend the sphere of operations. This was accomplished by legislatve enactment on May 14, 1903, under which Evanston, Wilmette and other communities north to the Lake county line and the Calumet and Blue Island territory on the south side were added to the Sanitary District. To service the first-mentioned portion of these lands, the North Shore channel was dug from Lake Michigan west through Wilmette and then southerly about eight miles to a juncture with the north branch of the Chicago river. The new area on the south was to be drained by an auxiliary channel extending from the Little

Calumet river just east of Blue Island, almost due westward through the Sag valley to a connection with the main channel at Sag, sixteen miles southwest of Chicago. Such construction, however, would obviously result in cutting across the old Illinois and Michigan canal thereby destroying the means of water transportation required to be kept intact by the Federal law of 1827. To provide against this the Illinois act of 1903 specifically required that if the Calumet-Sag auxiliary channel was, in fact, built, then the Sanitary District should first extend its main channel from the controlling works near Lockport southerly to the so-called upper basin at Joliet through which boats crossed the Des Plaines river to the lower reaches of the Illinois and Michigan canal. In this requirement lies the true reason, as we see it, for the extension of the main channel of the Sanitary District although such significance has been disregarded in previous decisions and in the arguments on the present case.

Work was soon commenced in the main channel extension which was about four miles in length. In that distance the ground level dropped thirty-eight feet which was far more than necessary for a three-mile-per-hour current, so a dam and ship lock were built at the end of the first two miles in which most of the decline occurred. This sudden drop naturally provided excellent means for development of electricity through water power, and, accordingly, a hydro-electric plant was built on the west edge of the channel at that point. The necessary head race, tail race and other facilities were constructed and the Sanitary District has since (including 1940) sold electricity to many cities, as well as provided for its own requirements, all as contemplated by the 1903 act. The extension was completed in 1908, and boats soon started using the entire channel from Chicago to Joliet. Between the same cities the old Illinois and Michigan canal was completely abandoned when the Calumet-Sag cut was finally made in 1914.

Major construction by the Sanitary District was finished with this last-mentioned addition but its area has been increased from time to time since then.

In chronological order, it is necessary to next refer to the Illinois waterway particularly since it led directly to the Federal control upon which appellant strongly relies as establishing its contention. Contrary to popular belief, the Illinois waterway begins not at Joliet but at the above-described power plant of the Sanitary District in Lockport township. This was so provided by the act first authorizing it and by the act of June 17, 1919, under which it was finally constructed. (Ill. Rev. Stat. 1943, chap. 19, pars. 79-112.) From there it was to extend through the last two miles of the Sanitary District channel, the upper basin, the Des Plaines river, and the Illinois river to Utica, or through the lower reaches of the Illinois and Michigan canal, or by such other adjacent channels as might be necessary. To finance construction a $20,000,000 bond issue was authorized by constitutional amendment. Work progressed rather slowly until 1930 when about $15,000,000 had been spent, but many bridges, dams and locks remained to be built, as well as channels dredged, to complete the dream of a deep waterway from the lakes to the gulf. On March 19 of that year, Governor Louis L. Emmerson of this State wrote the United States Secretary of War suggesting that the Federal government take over completion of the Illinois waterway as a matter of national importance. This was done, without ceremony, under the Rivers and Harbors Act of July 3, 1930.

With $7,500,000 appropriated by the Federal government, in addition to the funds remaining on hand with the State of Illinois, the Des Plaines and Illinois rivers were dredged to a depth of ten feet and the necessary facilities constructed whereby the Illinois waterway became a reality in 1932. Since that time the War Department has supervised navigation throughout the entire length of the Sani-

tary District channel as well as the Illinois waterway. It does the necessary dredging and has installed navigation aides on all bridges and at other appropriate places. It has built, or required the Sanitary District to build, fences twelve to fifteen feet from each edge of the channel and around the locks and powerhouse. It prohibits the Sanitary District from leasing or selling land adjacent to the channel without first obtaining a permit. Its consent is also required when any sewer or drain connection is made by an adjoining community. The War Department also specifies the water levels to be maintained in the channel and manipulates the flow when extraordinary measures are necessary to allow the passage of a particular boat. From 1930 to 1940, traffic over the channel and waterway increased from 92,228 tons to 4,668,712 tons. As a result of these elements of control exercised by the Federal government, together with the acknowledged use of the Sanitary District channel as a link in what has become an international waterway, appellant submits that the prism of the channel is exempt from the taxes in question.

The evidence also showed that Lemont and Lockport, both cities of about 3,500 population and outside the Sanitary District, empty their sewage into the main channel, one direct and the other by means of a small creek. Willow Springs, a smaller community, likewise uses the channel. Appellant claims these facts also impart a "public purpose" characteristic. We shall consider this point first.

Any exemption which might be granted in this case must be based upon section 19 of the Revenue Act of 1939, which provides: "All property described in this section to the extent herein limited, shall be exempt from taxation, that is to say: * * * (9) All market houses, public squares and other public grounds owned by a municipal corporation and used exclusively for public purposes; * * *." (Ill. Rev. Stat. 1943, chap. 120, par. 500.) With minor changes, this provision has been in

our laws since the constitution of 1870, article IX, section 3 of which gave the legislature power to exempt property of municipal corporations, among others, by general law. The limitations of the Revenue Act just quoted are explicit and were fully considered in the landmark case of *Sanitary District* v. *Martin,* 173 Ill. 243. True, the channel was not in operation when that decision was announced but section 25 of the Sanitary District Act of 1889 was, of course, in full force and effect and was specifically referred to by the court. That section still remains in its original form and while it does reserve to any city, village, township, or body politic on the Des Plaines or Illinois rivers the right to drain into the Sanitary District channel, yet the appellant is given the power to specify the terms and conditions upon which connections may be made by other sanitary districts or communities. (Ill. Rev. Stat. 1943, chap. 42, par. 347.) The situation is aptly summarized in the *Martin case* wherein it is stated: "It can hardly be said that the lands of the appellant are open to the use of the public generally for drainage purposes." The Sanitary District knew of the conditions imposed by section 25 but proceeded with eyes open; it was a small price to pay for the far-reaching privileges given. Thus, with respect to public sanitation, the facts in this case do not warrant application of the principle urged by appellant. See *People ex rel. Davis* v. *City of Chicago,* 124 Ill. 636, *Bloomington Cemetery Ass'n* v. *People ex rel. Baldridge,* 170 Ill. 377, and *People ex rel. Thompson* v. *First Congregational Church,* 232 Ill. 158, where it is announced by this court that all laws exempting property from taxation will be subject to a strict construction by the courts, and nothing will be held to come within the exemption which does not clearly appear to be exempt. More will be said later of the effect of using the channel for developing electricity.

The second contention presents a more complex problem. As to the effect of navigation alone, appellant has received adverse rulings in the well-known cases of *Sanitary District* v. *Martin,* 173 Ill. 243, *Sanitary District* v. *Gifford,* 257 Ill. 424, *Sanitary District* v. *Board of Review,* 258 Ill. 316, and *Sanitary District* v. *Young,* 285 Ill. 351. However, the amount of traffic has admittedly increased many fold and the item of Federal control is entirely new, so it is hardly a proper answer to merely cite the above cases. Nevertheless, realizing the formidable barrier presented by those decisions, appellant repeatedly stressed, by the evidence below and in its briefs in this court, that the primary reason for the construction of the Sanitary District channel has been overlooked to a large degree. That motive, says appellant, was to provide a deep waterway from the Great Lakes to the gulf. To this we cannot subscribe. While it is true it was long the dream of our forefathers to provide such a means of commerce, that consideration paled into the background when the health of all Chicago and the Illinois valley became imperiled as it did in the closing quarter of the last century. From that time forward until remedied, the principal concern was sanitation, and navigation became incidental, or at most, secondary. True, section 24 of the Sanitary District Act contemplated that the channel would become a navigable stream, but it was only natural and logical that when such a watercourse was once constructed every reasonable use should be made of the same. As pointed out above, in connection with the matter of sanitation, the Sanitary District knew this easement was reserved to the public and it must be held to have exercised the privileges given with that in mind. The Illinois and Michigan canal remained the only means of water transportation from the lakes to the Mississippi for several years after the main portion of the Sanitary District channel was first constructed and the former could well have been enlarged except that it was,

of course, useless to have two such waterways between the same points.

Nor can we accept appellant's argument that lake diversion is now permitted only because of navigation in the Chicago river and thus the channel is in the same category. The record shows that until about 1910, or later, no sewage disposal plants were in operation and dilution by water from Lake Michigan was the only treatment. As a result of the great increase in population, withdrawal soared to over 400,000 cubic feet per minute. This brought on a series of lawsuits commonly known as the *Diversion cases, i.e., Sanitary District* v. *United States,* 266 U. S. 405, 69 L. ed. 352, *Wisconsin* v. *Illinois,* 278 U. S. 367, 73 L. ed. 426, and *Wisconsin* v. *Illinois,* 281 U. S. 179, 74 L. ed. 799. We have read those decisions, the sum and substance of which were to require the Sanitary District to install sewage disposal plants over a period of years during which time total diversion from the Great Lakes-St. Lawrence watershed was to be reduced periodically until December 31, 1938, when the annual average was to be 1500 cubic feet per second which was the quantity still being diverted during 1940. But in answer to contentions of the plaintiff that all diversion through the Sanitary District channels should be stopped, Justice Holmes said in the last-mentioned case: "These demands seem to us excessive upon the facts in this case. The master reports that the best way of preventing the pollution of navigable waters is to permit an outflow from the drainage canal at Lockport, and that the interests of navigation in the Chicago river as a part of the port of Chicago will require the diversion of an annual average of from 1,000 c.f.s. to 1,500 c.f.s., in addition to domestic pumpage after the sewage treatment program has been carried out. * * * We think that, upon the principles stated in *Missouri* v. *Illinois,* 200 U. S. 496, 520, *et seq.* 50 L. ed. 572, 578, 26 Sup. Ct. Rep. 268, the claims of the complainants should not be pressed to a

logical extreme without regard to relative suffering and the time during which the complainants have let the defendants go on without complaint." Thus, on equitable principles the Federal government is likewise interested in sanitation and that original, primary purpose is, accordingly, maintained. Appellant cannot well dispute that considerable diversion is still necessary for such need because the evidence in this case shows that its sewage disposal system is far from perfect. We say this not by way of criticism but simply because by its own testimony the best that ever can be expected is 85 to 90 per cent efficiency. During 1940, all sewage in the district was being treated to some extent but only 60 per cent of the solids were entirely removed whereby the equivalent of about 40 per cent of the sewage was treated by dilution only. Based upon population in the district, the effect was as though untreated sewage from 1,600,000 people was being removed by the current of the channel.

The elements of Federal control are no more conclusive in our opinion. On this point we again allude to section 24 of the original Chicago Sanitary District Act which provided that the channel would become a navigable stream and that the "general government shall have full control over the same for navigation purposes." Later, in the 1903 act enlarging the district, section 3 thereof stated: "The rules of the United States Government now in force, regulating navigation on the Chicago River shall govern navigation on the channels of said Sanitary District of Chicago: * * *." (Ill. Rev. Stat. 1943, chap. 42, par. 363.) The other acts of the War Department, more specifically enumerated hereinabove, are merely incidental to its control of navigation as granted by the legislature and reaffirmed by Governor Emmerson when he solicited the aid of the Federal government. The benefits received by way of dredging and other outlays certainly more than offset any inconvenience which may be experienced by the district.

Increased traffic does not alter the situation because the primary reason for the existence of the channel in 1940 was sanitation, as we have demonstrated above. That is merely a matter of degree with reference to a previously known factor. It should reasonably have been expected and does not change the fundamental characteristic of a sewage outlet.

Even with the channel a navigable waterway it does not necessarily escape taxation. This was clearly held in the recent case of *Susquehanna Power Co.* v. *State Tax Commission*, 283 U. S. 291, 75 L. ed. 1042, which involved the right of Maryland to tax land underlying the Susquehanna river above a dam of the plaintiff constructed to generate electricity. In deciding that the privilege granted the power company by the Federal Power Commission was entirely separate from the real estate necessary to effect the governmental purpose it was said: "Lands privately owned are subject to state taxation although lying under navigable waters, (*Central R. Co.* v. *Jersey City*, 209 U. S. 473, 52 L. ed. 896, 28 S. Ct. 592; *Leary* v. *Jersey City*, 248 U. S. 328, 63 L. ed. 271, 39 S. Ct. 115,) as is private property in which the federal government may have an interest, (*Baltimore Shipbuilding & Dry Dock Co.* v. *Baltimore*, 195 U. S. 375, 49 L. ed. 242, 25 S. Ct. 50; *New Brunswick* v. *United States*, 276 U. S. 547, 72 L. ed. 693, 48 S. Ct. 371; *Shaw* v. *Gibson-Zahniser Oil Corp.* 276 U. S. 575, 72 L. ed. 709, 48 S. Ct. 333,) or which is subject to its control in the exercise of its power over navigable waters. (*Henderson Bridge Co.* v. *Kentucky*, 166 U. S. 150, 41 L. ed. 953, 17 S. Ct. 532; *Keokuk & H. Bridge Co.* v. *Illinois*, 175 U. S. 626, 44 L. ed. 299, 20 S. Ct. 205.)" Such holding is not in conflict with the case of *Moline Water Power Co.* v. *Cox*, 252 Ill. 348, strongly relied on by appellant, for there the United States had *exclusive* legislative control of the channel and land in question by virtue of article I, section 8 of the Federal constitution, under which rights were acquired

by the Federal government for the establishment of an arsenal. Furthermore, the Illinois laws specifically exempted such lands from taxation.

This matter of water power brings us to the final reason why relief cannot be granted appellant as prayed. The evidence is plain that a large hydro-electric plant is maintained by the district at the point in Lockport township where the channel drops thirty-eight feet by means of locks. This was about midway along the extension built under the 1903 act. Since that time electricity has been generated and sold by appellant just as any other private commercial concern might do. The amount sold in 1940 does not show in the record but it must have been very substantial because it appears from the case of *Sanitary District* v. *Young,* 285 Ill. 351, that sales in 1915 totalled almost one million dollars and there is nothing to indicate a material reduction. Such electricity is generated by water diverted from the channel through a head race of about one thousand feet, and the water is returned to the channel through a tail race, all of which are adjuncts to the powerhouse and not navigation. Substantial repairs were made to the powerhouse in 1934, partly to meet the effect of the reduced flow which would result under the last *Diversion case,* but mainly to replace worn out water wheels. Such operations are purely private and necessarily require use of the channel above the powerhouse at least as a conduit for the very water which creates the electricity. From what we have heretofore set forth, it is apparent that the primary use of the drainage canal down to the power plant has been for sanitation purposes and for the development of water power used in connection with the large hydro-electric plant. Thus, down to the powerhouse the channel fails to meet the tests which might exempt it from taxation.

A somewhat different situation appears to exist with reference to the portion of the channel in Lockport town-

ship below the powerhouse. That part is not necessary for generating electricity except that it incidentally carries water on down to the upper basin. The reason the district built the channel extension was to comply with the 1903 act which required a navigable waterway to Joliet in the event the Illinois and Michigan canal was severed. The usefulness of the Illinois and Michigan canal had previously been greatly diminished by reason of the holding of this court in the case of *Burke* v. *Snively*, 208 Ill. 328. The court there held that separate section 3 of the constitution prohibits an appropriation by the legislature in aid of the Illinois and Michigan canal, and limits the power of the legislature in the matter of such aid to the surplus earnings of the canal for its enlargements and extensions. This lower part of the channel, however, still plays an important part in the aid of sanitation, which is its predominant feature.

Under those circumstances, we apply the principle clearly stated in *School of Domestic Arts* v. *Carr*, 322 Ill. 562. It was there said: "It is the primary use to which the property is put which determines the question whether it is exempt from taxation, and the conclusion in each case depends upon the facts applicable thereto." To the same effect see *People ex rel. Baldwin* v. *Withers Home*, 312 Ill. 136, and *People ex rel. Harding* v. *Psi Upsilon Fraternity*, 335 Ill. 317.

By this conclusion, we do not conceive how the above-mentioned four cases of *Sanitary District* v. *Martin*, 173 Ill. 243, *Sanitary District* v. *Gifford*, 257 Ill. 424, *Sanitary District* v. *Board of Review*, 258 Ill. 316, or *Sanitary District* v. *Young*, 285 Ill. 351, can be overruled. Accordingly, the injunction prayed for was properly denied by the circuit court of Will county, and the complaint properly dismissed. The decree of the court is hereby affirmed.

*Decree affirmed.*